*Everett Smith v. State of Maryland*, No. 1273, Sept. Term 2020.  Opinion filed on October 27, 2021, by Berger, J.


INHERENT PREJUDICE - RIGHT TO FAIR TRIAL - "THIN BLUE LINE" FLAG FACE MASK

The appellant was not deprived of his constitutional right to a fair trial when the trial court permitted a uniformed law enforcement officer serving as a courtroom bailiff to wear a "thin blue line" flag face mask in the courtroom.  The "thin blue line" flag symbol does not have one generally accepted meaning and is interpreted to mean a wide variety of things. Because a wide range of inferences could be drawn from the "thin blue line" flag face mask, the wearing of this symbol by a uniformed law enforcement officer did not constitute inherent prejudice that deprived the accused of his right to a fair trial.

CLOSING ARGUMENT - SCOPE OF CLOSING ARGUMENT - RHETORICAL FLOURISH

The trial court did not commit reversible error by overruling defense counsel's objection to the prosecutor's closing arguments when the prosecutor described the teenage victim who testified at trial as having been "dragged through the mud" and argued to the jury that the victim's mental health history "did not matter."  The comments were an attempt to encourage the jurors to consider the victim's perspective when assessing the credibility of her testimony and were within the scope of permissible closing argument.

Circuit Court for Kent County
Case No. C-14-CR-19-000193

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1273

September Term, 2020

_____

EVERETT SMITH

v.

STATE OF MARYLAND

_____

Berger,
Wells,
Ripken,

JJ.

_____

Opinion by Berger, J.

_____

Filed:  October 27, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Following a jury trial in the Circuit Court for Kent County, Everett Smith, appellant, was convicted of second-degree child abuse and second-degree assault. On appeal, Smith presents two issues for our review, which we have rephrased as follows:

1. Whether Smith's right to a fair trial by a fair tribunal was violated when the circuit court denied Smith's request that courtroom bailiffs not wear "thin blue line" face masks during Smith's trial.

2. Whether the circuit court abused its discretion in its regulation of the prosecutor's closing argument.

For the reasons explained herein, we shall answer both questions in the negative and affirm the judgment of the circuit court.

**FACTUAL AND PROCEDURAL BACKGROUND**

On October 3, 2019, an altercation occurred between Smith and his fourteen-year-old daughter, L.H. At the time, L.H. and Smith were both residing at L.H.'s grandmother's home. L.H.'s telephone privileges had been revoked due to her behavior, but L.H. picked up a cordless telephone in the dining room to make a telephone call. L.H.'s grandfather had recently passed away, and L.H. wanted to call her other grandmother, whom L.H. described as her "safe person" in times when she was "in a state of mind where it's not really safe for [her]." L.H. was feeling "very anxious" and was experiencing a "panic attack." L.H. had previously experienced panic attacks, which presented with symptoms including "blanking out," where she did not "have full recollection of things" and was "not fully aware."

Smith saw L.H. pick up the cordless phone and began yelling at her, asking, "What are you doing and who are you calling?" Smith "grabbed the phone from [L.H.]" and hung it up. When L.H. "went to grab it again," Smith "got close to [L.H.] and smashed the phone on [her] head and threw it on the floor." Smith "continued to be in [L.H.'s] face so [she] couldn't really get away."

L.H. "pushed him away gently" in order to "get away from the situation." She walked toward the door, but Smith "got in [her] face right after that and began to hit [her]." Smith "punch[ed]" her multiple times on her head. L.H. "put [her] hands up on [her] head to try to protect [her]self as much as [she] could," but Smith continued to strike her. L.H. "tried to go out the back door," but Smith "continued to follow [her], cuss at [her], scream at [her] and everything." L.H. eventually was able to get out of the house. She ran out into the street screaming for help. L.H. ran down the street to her cousin's house. L.H. told her cousin that Smith was "trying to kill [her]" and asked her cousin to call the police, but she did not.

L.H. went to her aunt's porch "which was across the street" and saw Smith standing "outside trying to block the door" of L.H.'s grandmother's house. Ultimately, L.H. spent the night at her cousin's house. L.H. was "not feeling well" and was "dizzy." She was able to sleep that night, but the next morning, she vomited after eating breakfast. L.H.'s aunt called 911 and L.H. was subsequently transported to the hospital by an ambulance.

On cross-examination, defense counsel inquired, *inter alia*, as to whether L.H. remembered the incident accurately in light of the panic attack she was experiencing at the time. L.H. testified regarding her mental health history, explaining that she had received a

2

"pre-diagnosis" of bipolar disorder, which she explained as "steps to bipolar."[1]  L.H. testified that she had been previously diagnosed with bipolar disorder, but medical professionals informed her "that it was a misdiagnosis."  L.H. acknowledged that she had been diagnosed with depression, anxiety, and post-traumatic stress disorder and that she was taking Prozac.  When asked whether her panic attacks were "related to the diagnoses of depression, anxiety and PTSD," L.H. responded: "Suicidal comes with my head thoughts.  Those will come with the depression, anxiety and PTSD."

State Trooper Tanner Nickerson, the officer who responded to L.H.'s aunt's 911 call, testified at trial.  Smith told Trooper Nickerson that he struck L.H. "one time with an open hand."  When Trooper Nickerson asked Smith how many times he hit L.H., Smith "stated 'I'm not really sure.'"  Smith told Trooper Nickerson that "he wished to press charges on [L.H.]" because "he did nothing wrong and he was in self-defense."

Trooper Nickerson went to the hospital where L.H. had been transported.  Trooper Nickerson testified that "[t]he doctor told me directly that, yes, they did a brain scan on [L.H.] that came back clear" but "[t]hey believe that she had received a concussion."  Trooper Nickerson did not observe any other physical injuries on L.H.  Trooper Nickerson testified that L.H. told him that she had been struck with hands and elbows on her head.

Smith called L.H. as a witness during his case-in-chief.  When defense counsel inquired as to whether L.H. had "any long-term problem as a result of [her] concussion," L.H. answered that she experienced headaches as a result of her injuries.

---

[1] L.H. testified that the "only reason [medical professionals] said that [she had bipolar disorder] is because [her] parents have it."

Smith was convicted of second-degree child abuse and second-degree assault stemming from this incident. He received a sentence of fifteen years' imprisonment with all but five years suspended for the child abuse offense and a concurrent sentence of five years' imprisonment for the assault offense, to be followed by a five-year term of probation. Smith noted a timely appeal. Additional facts shall be discussed as necessitated by our consideration of the issues raised on appeal.

**I.**

The first issue raised by Smith on appeal focuses upon the trial court's denial of Smith's request that the trial court prohibit bailiffs from wearing "thin blue line" flag face masks in the courtroom.[2] Prior to the start of the trial, defense counsel objected to the "thin blue line" flag face mask that courtroom bailiffs were wearing, raising the issue in the following exchange:

> [DEFENSE COUNSEL]: So the defense has raised a couple of questions and I wanted to formally address those at this time.
>
> I think, first and foremost, we did not file a line or some sort of motion to preclude this from happening but have been communicating with the State and the [c]ourt over a period of a week or more regarding the facial coverings that the bailiffs have been ordered to wear.
>
> These facial coverings, as I understand it, are not a choice that the bailiffs have in terms of wearing or not wearing but, rather, have been ordered by the elected sheriff of this county to be as part of their uniform.
>
> These facial coverings, for the record, depict[] what is commonly [known] as the thin blue line, American Flag. It's

---

[2] The trial occurred during the COVID-19 public health emergency when face masks were required throughout Maryland's courthouses.

a black and white copy of an American Flag with one of the bars across instead of being in black, it is in blue. It makes a visual representation of this concept of a thin blue line as something that the police are standing between order and chaos. That they -- it is inherently a political statement. It is often used as a counterpoint in terms of arguments about whether black lives matter and if that's a political statement or not, this is often a counterpoint and an argument I think is inherently a political statement, especially if it's ordered by someone elected in political office.

I think that the [c]ourt can exercise its judicial power in establishing decorum and procedures in this courtroom and I think it, in fact, is inherent in judicial ethics to make sure that the Defendant receives every appearance of a fair trial and, in fact, does receive a fair trial.

The Defendant, Mr. Smith, and I have discussed this matter. He feels that the presence of this emblem on the facial coverings of the bailiffs indicates a bias in favor o[f] either police o[r] the State and therefore is preventing him from receiving --

THE COURT: Doesn't their . . . uniform do that?

[DEFENSE COUNSEL]: I don't believe that the uniform of a police office[r] is an inherently political statement.

I think that the facial covering, and this particular emblem, is used both by members of the police but also by member[s] of the public to indicate a political statement in support of police and in contradiction to some of the movements, social movements, that we're seeing today.

And, for that reason, Mr. Smith believes that having that representation on the facial coverings is making a political statement in a place that is supposed to be unbiased and providing a neutral and fair place for his trial today.

THE COURT: Okay. [Prosecutor].

[THE PROSECUTOR]: Thank you, Your Honor.

5

I don't think we can just assume that it is a political statement. I don't think we can take [defense counsel]'s argument for what that stands for [at] face value.

There's no evidence before the [c]ourt or the testimony from the sheriff or from the deputy what exactly this means. It simply is an American Flag with a blue stripe. There are no words present on it that convey anything.

The fact that it may even be political speech would inure more protections for it.

I think that argument, you know, has a little more merit, probably not any merit, but a little more merit with a uniform versus what is protected, constitutionally protected speech.

So the question is whether this mask, which it is the deputy's constitutional right to wear, whether that infringes on the Defendant's constitutional right to a fair and impartial trial. And I would submit that any potential bias is -- from -- from a face covering that probably nobody even noticed would be completely diminished by an officer wearing a uniform with a badge and a firearm.

And I think that this argument that this face mask needs to be swapped for something different just doesn't hold water.

Moreover, the mask, in and of itself, has more protections than a standard even paper mask that Your Honor's wearing. It's thick. It's got a filter. It serves a function[al] purpose to keep the deputies safe, beyond that which most people would wear.

Now that's argument and I can, you know, call the deputy to the stand and see if he has any knowledge of that but I don't think that this even gets -- the Defendant hasn't met his burden to even have this considered by the [c]ourt.

There's absolutely just conjecture and argument but really no substance.

THE COURT: All right. [Defense counsel.]

[DEFENSE COUNSEL]: But, Judge, an[ec]dotally, just for the [c]ourt's awareness, a similar email was sent by the deputy

6

public defender for Baltimore County to the court system there and they agreed with the public defender in that instance that this should not be present in the court procee[dings].

I'm happy to elicit testimony from the deputy who is present in the courtroom right now regarding whether or not he has been ordered to wear this face mask. I think that the State's argument that it's political speech and it would be the deputy's choice, is not present here because then he -- I don't believe he has the choice whether or not to wear that.

I think the only thing that would prevent him from wearing that is an order from this [c]ourt.

The trial court "assume[d], for the sake of argument [that the mask is] a political statement," noting that "that's only one possible interpretation." The trial court commented that "the case law is pretty clear that the courthouse is a public forum and that it's -- political speech is constitutionally protected and any regulation to limit it has to be narrowly tailored to serve a compelling government interest." The trial court further commented that "it's the [c]ourt's ability to enforce the decorum as the [c]ourt sees fit but it has -- that has to be done within the framework of the constitution."

Ultimately, the court denied Smith's request, explaining its ruling as follows:

Well, the [c]ourt's heard argument here today. The [c]ourt's going to find that while it is, you know, arguable, it's potential that these are intended to be a political statement, there is no evidence to suggest that that's what, in fact, it is; that it's merely something that the elected sheriff of this county has purchased for whatever reason and required his deputies to wear that it -- that even if it does reach the level of being only worn for -- to make some sort of political statement, that it's protected by the First Amendment to the Constitution in a public forum and therefore the [c]ourt's going to deny the request.

7

On appeal, Smith asserts that the trial court both abused its discretion and erred as a matter of law by denying his request that the court prohibit the bailiff from wearing a face mask depicting the "thin blue line" flag symbol in the courtroom. Smith contends that the "thin blue line" flag symbol is "a provocative, pro-police symbol" and asserts that the trial court "sabotaged [Smith's] right to due process and a fair trial" by permitting the mask to be worn. As we shall explain, we shall hold that the bailiff's wearing of the "thin blue line" mask in the courtroom was not so inherently prejudicial as to deprive Smith of a fair trial.

First, we briefly address Smith's contention that the trial court incorrectly applied the First Amendment standard for a public forum rather than a nonpublic forum. Smith devotes several pages of his brief to his argument that the trial court erred by determining that the symbol on the bailiff's mask "was protected by the First Amendment to the Constitution in a public forum." Smith asserts that the trial court's determination that a courthouse is a public forum was incorrect. The State concedes that although this precise issue has not been addressed by this Court or the Court of Appeals, the weight of authority outside Maryland has found that a courtroom is a nonpublic forum for First Amendment purposes. We agree. *See*, *e.g.*, *Mezibov v. Allen*, 411 F.3d 712, 718 (6th Cir. 2005) ("The courtroom is a nonpublic forum, where the First Amendment rights of everyone (attorneys included) are at their constitutional nadir. In fact, the courtroom is unique even among nonpublic fora because within its confines we regularly countenance the application of even viewpoint-discriminatory restrictions on speech."); *Berner v. Delahanty*, 129 F.3d 20, 26 (1st Cir. 1997) ("A courthouse -- and, especially, a courtroom -- is a nonpublic forum.").

8

In a nonpublic forum, the government has "much more flexibility to craft rules limiting speech" and "may reserve such a forum 'for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Minnesota Voters Alliance v. Mansky*, ___ U.S.___, 138 S. Ct. 1876, 1885 (2018) (quoting *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46 (1983)). In this case, however, in light of our determination that the wearing of the "thin blue line" flag face mask did not constitute inherent prejudice necessitating a new trial, which we shall explain, we need not delve further into the public forum issue.

Smith asserts that the trial court's decision to permit the courtroom bailiff to wear a "thin blue line" face mask in the courtroom was so inherently prejudicial as to deprive him of his right to a fair trial. We note that Smith does not assert actual prejudice as a result of the bailiff's mask. Rather, Smith asserts that the bailiff's thin blue line face mask was inherently prejudicial.

"[C]ertain courtroom practices are so inherently prejudicial that they deprive the defendant of a fair trial." *Carey v. Musladin*, 549 U.S. 70, 72 (2006). "Whenever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.'" *Holbrook v. Flynn*, 475 U.S. 560, 570 (1986) (quoting *Estelle v. Williams*, 435 U.S. 501, 505 (1976).

The Court of Appeals has explained that the determination of whether a particular courtroom practice "violate[s] a defendant's due process rights must be made upon a case-by-case basis." *Bruce v. State*, 318 Md. 706, 721 (1990). A reviewing court must

> look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.

*Id.* (quoting *Holbrook*, *supra*, 475 U.S. at 572). Practices that have been held to be inherently prejudicial include the compelling of an accused to stand trial before a jury while dressed in identifiable prison clothes, *Estelle*, *supra*, 435 U.S. at 512,[3] and the "use of physical restraints visible to the jury, absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005). Inherent prejudice is "difficult to establish." *Hill v. Ozmint*, 339 F.3d 187, 199 (4th Cir. 2003).

In contrast, the presence of identifiable law enforcement officers in the courtroom does not generally implicate a due process concern:

> The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the ***wider range of inferences that a juror might reasonably draw from the officers' presence.*** While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating

---

[3] In *Estelle*, the Court held that the defendant in that case had waived any objection to being tried in prison clothes by failing to object at trial. *Id.* at 512-513.

10

> from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm. *See Hardee v. Kuhlman*, 581 F.2d 330, 332 (CA2 1978).

*Bruce*, *supra*, 318 Md. at 718-19 (quoting *Holbrook*, *supra*, 475 U.S. at 569) (emphasis supplied).

Smith asserts that the "thin blue line" flag symbol is an inherently political symbol that has become popularized as a response to the Black Lives Matter movement and that the presence of this symbol on a mask worn by a courtroom bailiff deprived him of a fair trial. Smith cites an NPR article discussing the controversy around the "thin blue line" flag symbol, observing that proponents say that the symbol "is meant to represent the men and women in blue standing as a line between law and order . . . and it's been hung as a show of police pride and solidarity." Smith, T. *Thin Blue Line Flags Stir Controversy in Mass. Coastal Community*, NPR (July 1, 2020), available at https://www.npr.org/2020/07/31/897615425/thin-blue-line-flags-stir-controversy-in-mass-coastal-community (accessed October 7, 2021), archived at https://perma.cc/2H4W-8H77. The article explains that others characterize the symbol differently, observing that "[b]ecause the flag has also been associated with white supremacist groups, some say it symbolizes a blatantly racist agenda. And since it has also been adopted by the 'Blue Lives Matter' movement, which launched

in response to the Black Lives Matter movement, many believe it connotes opposition to the goals of ending police brutality and systemic racism." *Id.*

In further support of his assertion that the bailiff's "thin blue line" flag face mask was inherently prejudicial, Smith points to several additional articles and sources. Smith directs our attention to an opinion piece by Jeff Sharletis, an Associate Professor of English and creative writing at Dartmouth College, who argues that the thin blue line symbol "poses the old question of organized labor -- which side are you on? -- as a loyalty test" and emphasizes the connection between the symbol and the "Blue Lives Matter movement, which began after the December 20, 2014, slaying of two New York City police officers." Jeff Sharletis, *A Flag for Trump's America*, Harpers (July 2018), available at https://harpers.org/archive/2018/07/a-flag-for-trumps-america/ (accessed October 7, 2021), archived at https://perma.cc/YC56-K3G2. Smith also directs our attention to an article authored by Professor Seth Stoughton of the University of South Carolina School of Law, who described the "thin blue line" as an "intentionally evocative" symbol that has had "multiple variations . . . all of which depict law enforcement as standing alone, the only barrier that protects an otherwise helpless society." Seth W. Stoughton, *Principled Policing: Warrior Cops and Guardian Officers*, 51 Wake Forest L. Rev. 611, 636 (2016).

In his reply brief, Smith quotes extensively from a piece from the Baltimore Sun Editorial Board that was published in response to a mandate issued by Chief Judge John P. Morrissey of the Maryland District Court banning all District Court employees from wearing any items displaying the "thin blue line symbol" in the Maryland District Court

courthouses.[4]  The Editorial Board praised Judge Morrisey's action, commenting that "thin blue line" flag symbol "is problematic wherever -- and by whomever -- it's worn, given its association with white supremacist groups and others offended by the Black Lives Matter movement and protests over police killings of Black people."  Baltimore Sun Editorial Board, *Banning 'Thin Blue Line' Masks In Maryland District Courts The Right Thing To Do, Circuit Courts Must Follow*, Baltimore Sun (May 7, 2021), available at https://www.baltimoresun.com/opinion/editorial/bs-ed-0510-blue-line-maryland-courts-20210507-jjtvek6ljzemfnt5lznksd3joa-story.html (accessed October 7, 2021), archived at https://perma.cc/VA99-WHLX.  The Editorial Board maintains that "[e]mployees who don the ["thin blue line"] mask risk giving the impression that the courts would favor police in cases involving charges against law enforcement, or that they might even take a hard stance against any defendant and give police the benefit of the doubt in all cases."  *Id.*  The Board further contends that "[w]hether that's in fact the case or not [in a particular case] matters little; even the perception of bias hurts the credibility of the court."  *Id.*

No doubt, the "thin blue line" flag is perceived by many as a racist symbol antithetical to the Black Lives Matter Movement.  Others, however, perceive the "thin blue line" flag to be a general symbol of support of law enforcement or pride in policing.  In this appeal, however, we are not asked to determine whether the wearing of a "thin blue line" flag face mask by courtroom bailiffs is a wise practice, or whether Chief Judge Morrissey's prohibition of the wearing of such symbols in the District Court of Maryland

---

[4] We were not provided with a copy of Judge Morrissey's order.  Some language from the order is quoted in "*The Sun*" Editorial Board's piece.

was a prudent and sensible decision.[5]  Indeed, Judge Morrissey's determination that "[e]mployees of the District Court wearing any clothing item or apparel which promotes or displays a logo, sticker, pin, patch, slogan, or sign which may be perceived as showing bias or favoritism to a particular group of people could undermine the District Court's mission of fair, efficient, and effective justice for all and call into question the Judiciary's obligation to remain impartial and unbiased" is eminently reasonable.  It is entirely appropriate for the judiciary and individual judges to take measures to ensure that all court personnel -- from the judge to the courtroom clerk to the bailiff -- appear neutral and unbiased at all times.  In this appeal, however, we are mindful of the precise determination before us: whether the wearing of a "thin blue line" flag face mask by a courtroom bailiff is so inherently prejudicial as to deprive an accused of his constitutional right to due process.

Smith asserts that courtroom bailiffs and other staff are "extensions of the court" and must exhibit the same neutrality expected from the presiding judge.[6]  In connection

---

[5] We note that Judge Morrissey, as Chief Judge of the District Court of Maryland, is vested with the authority to make decisions regarding court policy in district court locations throughout Maryland.  Alternatively, each county circuit court is led by an administrative judge who oversees the day-to-day operations and has the authority to set similar policies for the circuit court of each county.

[6] Smith cites Maryland Rule 4-326(d) in support of this assertion.  Rule 4-326(d) addresses "Communications with Jury" and provides as follows:

> (1) *Instruction to Use Juror Number.* The judge shall instruct the jury, in any preliminary instructions and in instructions given prior to jury deliberations that, in any written

14

communication from a juror, the juror shall be identified only by juror number.

(2) *Notification of Judge; Duty of Judge.*

(A) A court official or employee who receives any written or oral communication from the jury or a juror shall immediately notify the presiding judge of the communication.

(B) The judge shall determine whether the communication pertains to the action. If the judge determines that the communication does not pertain to the action, the judge may respond as he or she deems appropriate.

(C) If the judge determines that the communication pertains to the action, the judge shall promptly, and before responding to the communication, direct that the parties be notified of the communication and invite and consider, on the record, the parties' position on any response. The judge may respond to the communication in writing or orally in open court on the record.

*(3) Duty of Clerk.*

(A) The clerk shall enter on the docket (i) the date and time that each communication from the jury or a juror was received by or reported to the judge, (ii) whether the communication was written or oral, and, if oral, the nature of the communication, (iii) whether the judge concluded that the communication pertained to the action, and (iv) if so, whether the parties and attorneys were notified and had an opportunity on the record to state their position on any response.

(B) The clerk shall enter in the electronic or paper file each written communication from the jury or a juror and each written response by the judge. Any identification of a juror other than the juror number shall be redacted.

(C) In any entry made by the clerk, a juror shall be identified only by juror number.

Md. Rule 4-326(d). We do not read Rule 4-326(d) as providing that courtroom bailiffs are to be considered extensions of the presiding judge.

15

with this argument, Smith discusses the case of *Parker v. Gladden*, 385 U.S. 363, 364 (1966). In *Parker*, the Supreme Court emphasized that "the official character of the bailiff -- as an officer of the court as well as the State -- beyond question carries great weight with a jury which he had been shepherding for eight days and nights." *Id.* at 365. The issue in *Parker* involved a bailiff who told certain jurors that a defendant was a "wicked fellow" who was "guilty" and that "[i]f there is anything wrong (in finding [the defendant] guilty)," the appellate court "will correct it." *Id.* at 363-64. We do not read *Parker* as broadly as Smith suggests. The *Parker* Court's comment that the bailiff was "an officer of the court" was within the context of assessing the impact of the bailiff's inappropriate comments to the jury. The characterization of the bailiff as "an officer of the court" was not a broad statement that the standard of conduct for a bailiff should be identical to that of a judge.

Indeed, as we discussed *supra*, the presence of uniformed law enforcement officers is a common practice in courtrooms across Maryland and across the United States and does not constitute inherent prejudice that would deprive an accused of the right to due process. *See*, *e.g.*, *Bruce*, *supra*, 720-21 (1990) (determining that the presence of a uniformed sheriff's deputy near the defendant in the courtroom was reasonable). A judge, on the other hand, would not be able to wear a police uniform in the courtroom without conveying an inappropriate pro-prosecution message.

The United States Supreme Court has explained that "[t]he chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably

16

draw from the officers' presence." *Holbrook*, *supra*, 475 U.S. at 569. In our view, a similarly wide range of inferences could have been drawn from the bailiff's "thin blue line" face mask. Even one of the authors cited by Smith in support of his assertion that the "thin blue line" symbol is inherently prejudicial acknowledges that the symbol is interpreted differently by different individuals.

For example, the NPR article cited by Smith observes that "some [people] see [the 'thin blue line' flag] as a proud tribute to police officers, and others denounce [it] as a racist symbol." Smith, T., *supra*. The flag has been "flown at Trump campaign rallies, at the white supremacist rally in Charlottesville, Virginia, and worn as face masks by officers policing the Black Lives Matter protests in 2020," but also has been "used to show support and mourn the deaths of five Dallas police officers who were ambushed by a gunman in 2016." Lauren Frias, *The 'Thin Blue Line': How a Simple Phrase Became a Controversial Symbol of the Police*, Insider (February 24, 2021), available at https://www. insider.com/how-thin-blue-line-became-controversial-symbol-to-represent-police-2021-2 (accessed October 7, 2021), archived at https://perma.cc/GU5F-PM92. The creator of the "thin blue line" American Flag, Andrew Jacob, asserts that "[t]he flag has no association with racism, hatred, [or] bigotry" but rather is "a flag to show support for law enforcement -- no politics involved." *Id.* Although the symbol has been affiliated with white supremacists and extremist events, some continue to view the "thin blue line" flag as a symbol of pride or support. Dallas Police Sgt. Stephen Bishop explained that "whenever he sees 'that flag as a sticker on a car or flying in someone's yard, I know that there is someone there that knows what I'm going through.'" *Id.*

17

In our view, the symbol of the "thin blue line" flag does not have one generally accepted meaning but instead is interpreted as meaning a variety of different things. Notably, the context in which the "thin blue line" face mask was displayed in this case must be considered. Specifically, the "thin blue line" flag at issue in this case appeared on the face mask of a uniformed and armed law enforcement officer serving as a courtroom bailiff.[7] Inasmuch as the "thin blue line" flag is seen by some as a symbol of general support for law enforcement, a reasonable juror may have inferred that the law enforcement officer wearing the "thin blue line" flag face mask was doing so in order to display his pride in being a law enforcement officer.[8] As in *Holbrook*, jurors may have drawn a "wide[] range of inferences" from the bailiff's face mask. Accordingly, we reject Smith's inherent prejudice argument and hold that the wearing of a "thin blue line" flag face mask by a uniformed courtroom bailiff did not constitute inherent prejudice depriving Smith of his right to a fair trial.

We are mindful to make explicit what this opinion does not hold. We do not suggest that a bailiff wearing a "thin blue line" flag face mask is a good practice, nor do we suggest that prejudice can *never* arise in different circumstances in which *actual prejudice* rather than *inherent prejudice* is alleged. Indeed, a litigant may have a reasonable argument that

---

[7] We note that there is nothing in the record about the specific role of this particular bailiff in the courtroom, the specific location where the bailiff was positioned in the courtroom, or the manner in which the bailiff interacted with jurors. This limited record fails to support a finding of inherent prejudice.

[8] That the bailiff was required to wear this particular mask at the direction of the Kent County Sherriff is irrelevant to the inherent prejudice determination.

18

a bailiff wearing a "thin blue line" flag face mask caused *actual prejudice* in a case involving, for example, allegations of excessive force or other misconduct by a law enforcement officer, or in a case in which a law enforcement officer's credibility is weighed against that of a layperson. Our opinion in this case does not foreclose such an argument. Furthermore, a prohibition on the wearing of "thin blue line" symbols by courthouse staff may be a prudent prophylactic measure to avoid issues on appeal, as well as to err on the side of caution to ensure litigants' right to a neutral and fair tribunal. Here, however, we do not deal with allegations of actual prejudice. Our holding, therefore, is limited to the inherent prejudice argument raised in this case and discussed *supra*.

## II.

The second issue raised by Smith on appeal stems from a comment made by the prosecutor during rebuttal closing argument. Specifically, Smith asserts that the circuit court abused its discretion by overruling his objection in the following exchange:

> [THE PROSECUTOR]: [L.H.] told you that she's now living in Georgia. Far away from the [S]tate of Maryland. She came up here, 15 years old, got on that stand and . . . . She had to reveal mental health diagnoses. She had to withstand an intense cross-examination . . . about minute by minute, second by second, things that happened over a year ago, October 4, 2019, over a year ago.
>
> Imagine, 15 years old. And she's been dragged through the mud today. And none of that matters.
>
> [DEFENSE COUNSEL]: I'm going to object to that statement.
>
> THE COURT: Overruled. It's argument.
>
> [THE PROSECUTOR]: None of that matters. What matters are the things that are relevant, things that relate to the crimes

19

charged. Her life, her history, her mental health, that is not on trial here. It is for you to evaluate certainly the testimony and things related to that. But do not disregard what she has to say simply because she's had a rough life.

We recently summarized principles and precedent governing our review of closing argument as follows in *Winston v. State*, 235 Md. App. 540, 572-73 (2018).

> "A trial court is in the best position to evaluate the propriety of a closing argument[.]" *Ingram v. State*, 427 Md. 717, 726, 50 A.3d 1127 (2012) (citing *Mitchell v. State*, 408 Md. 368, 380-81, 969 A.2d 989 (2009)). Therefore, we shall not disturb the ruling at trial "unless there has been an abuse of discretion likely to have injured the complaining party." *Grandison v. State*, 341 Md. 175, 243, 670 A.2d 398 (1995) (citing *Henry v. State*, 324 Md. 204, 231, 596 A.2d 1024 (1991). Trial courts have broad discretion in determining the propriety of closing arguments. *See Shelton v. State*, 207 Md. App. 363, 386, 52 A.3d 995 (2012).

> "[A]ttorneys are afforded great leeway in presenting closing arguments[.]" *Degren v. State*, 352 Md. 400, 429, 722 A.2d 887 (1999). "'The prosecutor is allowed liberal freedom of speech and may make any comment that is warranted by the evidence or inferences reasonably drawn therefrom.'" *Id.* at 429-30, 722 A.2d 887. "Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom; the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is [the] accused's counsel to comment on the nature of the evidence and the character of witnesses which the (prosecution) produces." *Wilhelm v. State*, 272 Md. [404, 412, 326 A.2d 707 (1974)]; *accord Degren v. State*, 352 Md. at 430, 722 A.2d 887.

> > While arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments [of] opposing counsel, generally speaking, liberal freedom of speech should be allowed. There are no hard-

20

and-fast limitations within which the argument of earnest counsel must be confined – no well-defined bounds beyond which the eloquence of an advocate shall not soar. He may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, ***and attack the credibility of witnesses. He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions.***

*Wilhelm v. State*, 272 Md. at 413, 326 A.2d 707; accord *Degren v. State*, 352 Md. at 430, 722 A.2d 887.

Even when a prosecutor's remark is improper, it will typically merit reversal only "'where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused.'" *Lawson v. State*, 389 Md. 570, 592, 886 A.2d 876 (2005) (quoting *Spain v. State*, 386 Md. 145, 158-59, 872 A.2d 25 (2005)).

*Winston v. State*, 235 Md. App. 540, 572-73 (2018) (emphasis supplied).

Although Smith acknowledges the wide latitude granted to attorneys in closing argument, Smith asserts that the prosecutor's comments that L.H. had been "dragged through the mud" and that certain topics raised during cross-examination "did not matter" undermined Smith's Constitutional right to confront his accuser and improperly denigrated defense counsel. As we shall explain, we perceive no such abuse of discretion by the trial judge in the regulation of the prosecutor's rebuttal closing argument.

Smith asserts that when the prosecutor commented that L.H. had been "dragged through the mud," the prosecutor improperly conveyed that Smith had subjected L.H. to re-victimization and trauma by exercising his right to cross-examine L.H. Smith analogizes to the case of *People v. Unger*, 749 N.W.2d 272 (Mich. Ct. App. 2008), in which

21

the Court of Appeals of Michigan commented that "the prosecution exceeded the bounds of proper argument when it suggested that defense counsel had 're-victimized' [the victim] during the course of trial." *Id.* at 293. In our view, the prosecutor's comment that L.H. had been "dragged through the mud" was not an attack on the defense but an attempt to encourage the jurors to consider L.H.'s perspective when assessing the credibility of her testimony. However inartful, the comment was within the range of "oratorical conceit or flourish" and "metaphorical allusions" permissible in closing argument. *Wilhelm*, *supra*, 272 Md. at 413.

Moreover, Smith concedes that the Court of Appeals of Michigan determined that the improper argument in *Unger* did not warrant reversal. 749 N.W.2d at 293. The court determined that the comments were "relatively brief and did not likely deflect the jury's attention from the evidence presented in this case" and also reasoned that the court had instructed the jury at the conclusion of trial that "[t]he attorneys' statements and arguments are not evidence" and that the jury "should only accept things the attorneys say that are supported by the evidence or by your own common sense and general knowledge." *Id.* In this case, the trial court propounded the following similar jury instruction:

> [T]he lawyers are permitted to give closing arguments. These arguments are not evidence. They are an opportunity for the lawyers to summarize to you and comment on the evidence that you have heard and to argue as to how you should decide the charges in this case.

Accordingly, we reject Smith's assertion that the prosecutor's reference to L.H. being "dragged through the mud" constitutes reversible error.

22

Furthermore, in our view, the prosecutor's reference to issues that "did not matter" was also within the range of acceptable closing argument. Smith asserts that this comment was similar to a comment held to be improper in *Beads v. State*, 422 Md. 1, 8 (2011). We disagree. In *Beads*, the prosecutor commented in closing argument that it was defense counsel's job "to throw up some smoke, to lob a grenade, to confuse." *Id.* The Court of Appeals agreed with the petitioner that these comments were improper but nonetheless determined that "[t]he prosecutor's comments about the role of defense counsel, although inappropriate, are unlikely to have 'misled or influenced the jury to the prejudice of the accused," and, therefore, did not constitute reversible error.

The allegedly improper comment in this case was much more limited and less extreme than those in *Beads*. The prosecutor did not cast aspersions on the role of defense attorneys in general or suggest that defense counsel was attempting to mislead the jury. Critically, after the trial court overruled the defense objection, the prosecutor specifically reminded the jury that it was their role "to evaluate [L.H's] testimony and things related to that" while asking them to "not disregard what she has to say simply because she's had a rough life."

In our view, the prosecutor's arguments were not improper but were instead attempts to encourage the jury to focus on L.H.'s testimony rather than mental health matters that the prosecutor asserted were irrelevant to the credibility determination. This is within the range of permissible closing argument. Accordingly, we hold that the circuit court did not abuse its discretion by overruling Smith's objection to the prosecutor's rebuttal closing arguments. Furthermore, assuming *arguendo* that the prosecutor's

comments were in any way improper, there is no indication that the jury was misled by the

challenged argument.  We, therefore, affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR KENT COUNTY AFFIRMED.  COSTS TO BE PAID BY THE APPELLANT.**