*Everett Smith v. State of Maryland*, No. 61, September Term, 2021. Opinion by Biran, J.

**CONSTITUTIONAL LAW – SIXTH AMENDMENT – RIGHT TO A FAIR TRIAL – INHERENT PREJUDICE.** Petitioner was tried on assault charges in the Circuit Court for Kent County in October 2020. At his trial, two bailiffs wore face masks that displayed the "thin blue line" flag. After Petitioner was convicted of two charges, he argued on appeal that the display of the thin blue line flag was inherently prejudicial to his right to a fair trial under the Sixth Amendment to the United States Constitution. The Court of Appeals held that, to prevail on a claim of inherent prejudice, the defendant must: (1) have objected to the challenged practice in the trial court; (2) demonstrate, based on the record of the proceeding in the trial court, that the challenged practice was observable by the jury; and (3) establish that the challenged practice created an unacceptable risk that impermissible factors would come into play in the jury's determination of the case. If the defendant meets all of these requirements, the State may attempt to show that the challenged practice was necessary to further a compelling governmental interest.

The Court held that the bailiffs' display of the thin blue line flag on their face masks was inherently prejudicial to Petitioner's right to a fair trial. The most benign meaning that can reasonably be attributed to the thin blue line symbol is a pro-law enforcement message. In a criminal trial, the display of a pro-law enforcement message in the courtroom is inappropriate. In this particular case, the display of the thin blue line symbol violated the Sixth Amendment because it was the bailiffs – agents of the court – who wore the offending masks, and because Petitioner's trial occurred at a time when the thin blue line symbol was particularly evocative.

Circuit Court for Kent County
Case No. C-14-CR-19-000193
Argued: June 1, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 61

September Term, 2021

---

EVERETT SMITH

v.

STATE OF MARYLAND

---

Watts
Hotten
Booth
Biran
Gould
Eaves
Getty, Joseph M.
   (Senior Judge, Specially Assigned),

       JJ.

---

Opinion by Biran, J.
Gould, J., and Getty, C.J., dissent.

---

Filed: August 26, 2022

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

2020 will be remembered as one of the most tumultuous years in American history. As the nation struggled to navigate the COVID-19 pandemic, a white Minneapolis police officer killed George Floyd, an unarmed African American man, on May 25, 2020. Floyd's murder, which followed multiple killings of African Americans around the country over the previous decade, galvanized the Black Lives Matter movement, leading to enormous protests and counter-protests around the nation throughout the summer of 2020. The pro-police "Blue Lives Matter" movement increased in prominence nationally as a response to Black Lives Matter and calls to "defund the police." The presidential campaign fanned the flames of controversy throughout the summer and into the fall of 2020.

The case before us here went to trial on October 14, 2020, against this backdrop of illness, fear, and civic and political unrest. In the Circuit Court for Kent County, the State charged Everett Smith, an African American man, with several criminal offenses arising from an alleged physical altercation with his 14-year-old daughter. In keeping with an Administrative Order issued by the Chief Judge of this Court, the trial court required all people in the courtroom for Smith's trial to wear face masks to prevent the transmission of COVID-19. At the time of Smith's trial, the Sheriff of Kent County was requiring all his deputies to wear face masks that displayed a "thin blue line" version of the American flag. The "thin blue line" is a controversial and polarizing symbol. Some view it as an expression of general support for law enforcement; others view it as a symbol of how police serve as a barrier between civilized society and criminals; and others view it as a racist symbol that expresses support for white supremacy and violence against African Americans.

The Sheriff's deputies who served as courtroom bailiffs during Smith's trial wore thin blue line face masks as required by the Sheriff. Immediately before jury selection, Smith's attorney asked the trial court to direct the deputy who was acting as the bailiff at that time to wear a different mask that did not include an image of the thin blue line. Believing the bailiff had a First Amendment right to wear the thin blue line flag mask, the trial court declined defense counsel's request. The jury convicted Smith of second-degree assault and second-degree child abuse by a custodian.

On appeal, Smith argued that the bailiffs' display of the thin blue line flag on their face masks violated his right to a fair trial under the Sixth Amendment to the United States Constitution. The Court of Special Appeals affirmed Smith's convictions. Although the intermediate appellate court recognized that a courtroom is not a public forum where restrictions on citizens' First Amendment rights are subject to heightened scrutiny, and the court expressed concern about the display of the thin blue line in courtrooms, it held that Smith did not his meet burden to demonstrate that he was deprived of a fair trial.

We conclude to the contrary. The bailiffs' display of the thin blue line flag – and the pro-law enforcement message it conveyed – was inherently prejudicial to Smith's right to a fair trial. We therefore vacate Smith's convictions and order a new trial.

## I

## America in the Fall of 2020

### A. The Maryland Judiciary's Reaction to the COVID-19 Pandemic

By mid-March 2020, COVID-19 had arrived in Maryland and was spreading rapidly throughout much of the State. Under the direction of the then-Chief Judge of this Court,

the Honorable Mary Ellen Barbera, Maryland's courts suspended most in-person hearings and initiated emergency procedures to protect the citizens of the State.[1] The unprecedented COVID-19 public health emergency caused the postponement of trials for months, as Maryland's citizens and judicial system grappled with the global pandemic.

In May 2020, Chief Judge Barbera issued an administrative order lifting the prohibition on jury trials, with trials to resume after October 5, 2020.[2] In October 2020, Chief Judge Barbera issued an amended administrative order on the phased resumption of operations as well as an amended administrative order on the resumption of trials scheduled to begin on October 5.[3] Trials were permitted to go forward with strict safety requirements, including required masking in court buildings, mandatory quarantining, etc. Jury trials subsequently resumed under these mandated reopening and safety precautions.

## B. The Murder of George Floyd and Subsequent Unrest

On May 25, 2020, George Floyd, an African American man, was killed by Derek Chauvin, a white Minneapolis police officer, during Floyd's arrest for allegedly using a

---

[1] *See* Maryland Courts, *(COVID-19) Administrative Orders*, available at https://perma.cc/M4K7-T9DL. Maryland's Judiciary continued in a health emergency posture until March 28, 2022. During that two-year period, the changing circumstances and phases of COVID-19 required continued adaptation by the courts and citizens of the State.

[2] *See* Order: Lifting the Statewide Suspension of Jury Trials and Resuming Grand Juries (May 22, 2020), available at https://perma.cc/Z9V8-7WDD.

[3] *See* Second Amended Administrative Order Lifting the Statewide Suspension of Jury Trials and Resuming Grand Juries (Oct. 2, 2020), available at https://perma.cc/7ZTL-AW8G; Second Amended Administrative Order on the Progressive Resumption of Full Function of Judiciary Operations Previously Restricted Due to the COVID-19 Emergency (Oct. 2, 2020), available at https://perma.cc/X8UZ-3EG5.

counterfeit 20-dollar bill at a convenience store.[4] Officers stopped Floyd, pulled him out of his vehicle, and restrained him on the ground. Chauvin kneeled on Floyd's neck for over eight minutes. An unresponsive Floyd was declared dead, and his death was ruled a homicide.[5]

Bystanders' videos of Floyd's killing spread rapidly, sparking widespread outrage against police brutality and racial injustice. Major cities across the United States saw large protests and civil rights demonstrations. The Black Lives Matter movement ("BLM"), founded in response to George Zimmerman's fatal shooting of Trayvon Martin in 2012, gained significant support and following in the aftermath of Floyd's murder.[6] This social outcry brought other recent killings of African Americans – in particular, Ahmaud Arbery

---

[4] *See, e.g.*, *How George Floyd Died, and What Happened Next*, N.Y. TIMES (May 19, 2022), available at https://perma.cc/S39N-KS44.

[5] Chauvin was charged with murder and related offenses in state and federal court. In 2021, Chauvin was convicted of second-degree unintentional murder, third-degree murder, and second-degree manslaughter in state court in Minnesota. John Eligon, et al., *Derek Chauvin Verdict Brings a Rare Rebuke of Police Misconduct*, N.Y. TIMES (Apr. 20, 2021), available at https://perma.cc/XPX4-QLX8. He subsequently was sentenced to 270 months of imprisonment. Tim Arango, *Derek Chauvin is sentenced to 22 and a half years for murder of George Floyd*, N.Y. TIMES (June 25, 2021), available at https://perma.cc/ZH88-PK27. Chauvin also pled guilty in federal court to violating Floyd's civil rights and was sentenced to 252 months in that case. Chauvin's federal sentence will run concurrently with his state sentence. Nicolas Bogel-Burroughs, *Derek Chauvin Pleads Guilty to Violating George Floyd's Rights*, N.Y. TIMES (Dec. 15, 2021), available at https://perma.cc/RYE8-YPSH.

[6] *See* Larry Buchanan, et al., *Black Lives Matter May Be the Largest Movement in U.S. History*, N.Y. TIMES (July 3, 2020), available at https://perma.cc/7C7Q-2AAX.

and Breonna Taylor – to national attention. Ahmaud Arbery was murdered by white men while out jogging; Breonna Taylor was killed by police in her own home.[7]

These highly publicized killings of African American men and women, and subsequent protests, led to widespread calls for police accountability, combatting of reported systemic racism in law enforcement, and introspection concerning police interaction with people of color. A call to "defund the police" gained support among protestors and reformers, leading to public discussion, proposals, and policymaking in cities and states across the country.[8] Proponents of the "defund the police" movement sought to restructure and reallocate police responsibilities and funding toward other resource investments in communities, such as addressing housing and education disparity, mental health, poverty, and social services.[9] Many law enforcement organizations and pro-law enforcement groups took defensive postures toward these calls to "defund the police."[10]

---

[7] Richard Fausset, *What We Know About the Shooting Death of Ahmaud Arbery*, N.Y. TIMES (Feb. 7, 2022), available at https://perma.cc/9M9X-7HJL; Richard A. Oppel Jr., et al., *What to Know About Breonna Taylor's Death*, N.Y. TIMES (Apr. 26, 2021), available at https://perma.cc/565B-3DKE.

[8] Giovanni Russonello, *Have Americans Warmed to Calls to 'Defund the Police'?*, N.Y. TIMES (July 3, 2020), available at https://perma.cc/72SH-8L3F.

[9] *See* Farah Stockman and John Eligon, *Cities Ask if It's Time to Defund Police and 'Reimagine' Public Safety*, N.Y. TIMES (June 5, 2020), available at https://perma.cc/2NW7-GAGT (detailing Minneapolis, Los Angeles, and New York City's discussions and decision-making on major police reforms).

[10] Juliana Kim and Michael Wilson, *'Blue Lives Matter' and 'Defund the Police' Clash in the Streets*, N.Y. TIMES (July 22, 2020), available at https://perma.cc/UHX4-F7T2 (stating that supporters of Blue Lives Matter "share a frustration with the criticism of police

## C. The "Thin Blue Line" Flag

Counter-protests to BLM also appeared around the country during the summer of 2020. Pro-law enforcement demonstrations, *e.g.*, the "Blue Lives Matter" movement launched in response to murders of New York City police officers in 2014, served as a counterpoint to the BLM and "defund the police" movements.[11] The "thin blue line" symbol, while having existed for some time, began to appear more frequently at these counter-protests.

### 1. The "Thin Blue Line"

The "thin blue line" draws its origins from the "thin red line" of the British Army during the Crimean War. During the battle of Balaklava, an unconventional two-deep line of Scottish infantry successfully repelled a Russian cavalry charge. TREVOR ROYAL, CRIMEA: THE GREAT CRIMEAN WAR, 1854-1856, at 266-68 (St. Martin's Press, 2000). The soldiers wore red uniforms and were described as a "thin red streak" or "thin red line" standing as the line in defense of their country. *Id.* at 267-68. This usage and imagery of a "thin red line" describing military as the last line of defense has continued into modern popular culture, including the 1998 film *The Thin Red Line*.

While it is unclear when exactly the thin red line inspired the creation of the "thin blue line," the phrase and image were first publicly used in the 1920s and became more

---

behavior and tactics and the calls to defund the police," and quoting a pro-police organizer as saying that "this movement to 'Back the Blue' was galvanized when calls to defund and abolish the police became a very real force in this country").

[11] *See id.* (describing a street altercation between supporters of law enforcement and BLM supporters in Brooklyn, NY).

widely known in the 1950s due to Los Angeles Police Department (LAPD) Chief William H. Parker.[12] Tasked with cleaning up department corruption, Parker reformed the LAPD from "local disgrace to national fame – a crisp, militaristic 'thin blue line' ...." Parker also established a department-sponsored TV program called "The Thin Blue Line" and consistently used the phrasing in interactions with the press.[13]

2. The "Thin Blue Line" Flag

There are at least two popular iterations of the "thin blue line" flag, one depicting a plain black flag with a large blue stripe across and another as a version of the American flag depicting black and white stars and stripes with a distinct blue line substituted for one of the stripes.[14] Andrew Jacob, president of Thin Blue Line USA, claims credit for creation of the thin blue line flag in 2014, although not the image itself.[15]

In 2020, some counter-protesters to BLM and pro-police protesters adopted the thin blue line image and flag as symbolic of their support for law enforcement.[16] The thin blue

---

[12] David Shaw, *Chief Parker Molded LAPD Image – Then Came the '60s: Police: Press treated officers as heroes until social upheaval prompted skepticism and confrontation*, L.A. TIMES (May 25, 1992), available at https://perma.cc/7W9U-Q627.

[13] *Id.*

[14] *See* Thin Blue Line USA, available at https://perma.cc/8BQ6-6XH4.

[15] Maurice Chammah and Cary Aspinwall, *The Short, Fraught History of the 'Thin Blue Line' American Flag*, POLITICO (June 9, 2020), available at https://perma.cc/WWQ6-J53F.

[16] *See, e.g.,* Kim and Wilson, *supra* note 10 (describing pro-police supporters waving thin blue line flags at a protest in New York City); Reuters Staff, *Fact Check: U.S. and 'Thin Blue Line' Flags Were Displayed at Trump Wisconsin Rally*, Reuters (Oct. 27, 2020), available at https://perma.cc/LTT2-SP8F (describing how "[t]he 'thin blue line' has

7

line flag also has been displayed by white supremacists and violent extremists. During the "Unite the Right" rally in Charlottesville, Virginia, in 2017, the thin blue line flag was flown by white supremacists along with Confederate and Neo-Nazi flags and symbology.[17] Due to white supremacist co-option of the thin blue line flag, some law enforcement agencies have banned the use of the image.[18]

3. The Various Potential Interpretations of the Thin Blue Line Flag

The thin blue line flag has been interpreted to convey several meanings and connotations, including showing support for law enforcement and "the men and women who put their lives on the line every day to protect us."[19] According to Thin Blue Line

---

also been displayed at rallies of the 'Blue Lives Matter' movement ... [and that] 'Blue Lives Matter' was launched in response to 'Black Lives Matter' …"); Alexander Mallin and Meredith Deliso, *Blue Lives Matter supporters arrested with slew of firearms outside Kenosha after police received tip about possible shooting, DOJ says*, ABC NEWS (Sept. 3, 2020), available at https://perma.cc/R4AV-NGB9.

[17] Sean Rossman, *'Thin Blue Line': What Does An American Flag With a Blue Line Mean?*, USA TODAY (Aug. 18, 2017), available at https://perma.cc/NGL9-X45K; Tovia Smith, *Thin Blue Line Flags Stir Controversy in Mass. Coastal Community*, NPR (July 31, 2020), available at https://perma.cc/MH2B-PHCH (stating how "the flag has also been associated with white supremacists groups").

[18] Chief Kristen Roman, *Thin Blue Line Update*, UW-Madison Police Department (Jan. 26, 2021), available at https://perma.cc/5BY4-QL95 (explaining that the thin blue line image had been co-opted by white supremacists and violent extremists who attacked the U.S. Capitol; that the image therefore had caused fear among some of the jurisdiction's citizens, and in light of those "relevant community concerns, perceptions, and fears," the thin blue line image was banned from public displays in official capacities).

[19] Thin Blue Line USA Blog, *What is the Meaning of the Thin Blue Line?* (Jan. 23, 2018), available at https://perma.cc/4EPU-U7YT.

USA, the flag can also indicate pride in law enforcement and patriotism.[20] Thin Blue Line USA also describes the symbolic meaning of the space "above the blue line [as] represent[ing] society, order and peace," while the space below indicates "crime, anarchy and chaos."[21] "The Thin Blue Line running between them, 'law enforcement,' keeps crime from pervading into society."[22] Lastly, Thin Blue Line USA speaks to the flag representing "courage and a tribute to those who have fallen in the line of duty."[23] Thin Blue Line USA has explicitly denounced any use of the flag by those with racist, violent, or extremist views, including those who protested in Charlottesville and at the United States Capitol on January 6, 2021.[24]

The flag is seen by some in law enforcement as something that "'holds [us] together' and 'protects us.'"[25] Or the thin blue line flag can stand for "'maintaining order during unrest.'"[26]

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*; Rossman, *supra* note 17.

[25] Rossman, *supra* note 17 (quoting Bill Johnson, executive director of the National Association of Police Organizations).

[26] *Id.*

However, "some say it symbolizes a blatantly racist agenda."[27] As LAPD Police Chief "Parker was known for unambiguous racism," many view the entire history of the thin blue line as steeped in anti-Black sentiment.[28] Because the flag and symbol have been used in counter-protests to BLM, "many believe it connotes opposition to ending police brutality and systemic racism."[29] On occasion, additional symbols associated with violence have been added to the flag, such as a skull associated with "the Punisher," a comic book character who extols extra-judicial violence and killings.[30] Some believe that "[w]hat originally began as a banner supporting law enforcement in recent years has been increasingly hijacked by White Supremacist groups who use it as a Neo-Confederate flag and symbol of the anti-Black Lives Matter movement."[31]

In sum, the attributed meanings of the thin blue line flag run the gamut from showing pride in and support of law enforcement to promotion of violent white supremacy.

---

[27] Smith, *supra* note 17.

[28] Chammah and Aspinwall, *supra* note 15.

[29] Smith, *supra* note 17.

[30] Chammah and Aspinwall, *supra* note 15.

[31] *Controversial "Thin Blue Line" Flag Replaces America's "Stars and Stripes" at Trump Rally in Waukesha*, Milwaukee Independent (Oct. 26, 2020), available at https://perma.cc/7B7L-79H4.

## This Case

### A. The Charges

On November 20, 2019, Smith was charged in the Circuit Court for Kent County by way of a Criminal Information with first-degree assault, second-degree assault, first-degree child abuse, and related charges. The charges arose from Smith's alleged assault of his 14-year-old daughter, L.H., on October 3, 2019.

### B. The Trial

Smith's case came on the docket for trial on October 14, 2020.

1. <u>The Defense's Objection to the Bailiff's Display of the Thin Blue Line Flag on His Face Mask</u>

Immediately prior to jury selection, defense counsel expressed concern about the courtroom bailiffs' display of the thin blue line flag on their face masks:

> So the defense has raised a couple of questions and I wanted to formally address those at this time. I think, first and foremost, we did not file a line or some sort of motion to preclude this from happening but have been communicating with the State and the Court over a period of a week or more regarding the facial coverings that the bailiff's [sic] have been ordered to wear.
>
> These facial coverings, as I understand it, are not a choice that the bailiff's [sic] have in terms of wearing or not wearing but, rather, have been ordered by the elected sheriff of this county to be as part of their uniform.
>
> These facial coverings, for the record, depict[] what is commonly [known] as the thin blue line, American Flag. It's a black and white copy of an American Flag with one of the bars across instead of being in black, it is in blue. It makes a visual representation of this concept of a thin blue line as something that the police are standing between order and chaos. That they - - it is inherently a political statement. It is often used as a counterpoint in terms of arguments about whether black lives matter and if that's a political

statement or not, this is often a counterpoint and an argument I think is inherently a political statement, especially if it's ordered by someone elected in political office.

I think that the Court can exercise its judicial power in establishing decorum and procedures in the courtroom and I think it, in fact, is inherent in judicial ethics to make sure that the Defendant receives every appearance of a fair trial and, in fact, does receive a fair trial.

The Defendant, Mr. Smith, and I have discussed this matter. He feels that the presence of this emblem on the facial coverings of the bailiffs indicates a bias in favor or [sic] either police of [sic] the State[.]

The trial court then asked defense counsel whether the bailiff's uniform also reflected a bias in favor of the police or the State. Defense counsel replied that he did not believe that a police uniform is "an inherently political statement," but that the symbol displayed on the bailiff's facemask "is used … by members of the police [and] also by member[s] of the public to indicate a political statement in support of police and in contradiction to some of the movements, social movements, that we're seeing today." Thus, according to the defense, "having that representation on the facial coverings is making a political statement in a place that is supposed to be unbiased and providing a neutral and fair place for his trial today."

The prosecutor responded: "I don't think we can just assume that it is a political statement…. There's no evidence before the Court or the testimony from the sheriff or from the deputy what exactly this means. It simply is an American Flag with a blue stripe. There are no words present on it that convey anything." However, if it was meant to be political speech, the prosecutor contended, such speech would be entitled to "more protections." Thus, the prosecutor framed the question for the trial court as "whether this

mask, which it is the deputy's constitutional right to wear, whether that infringes on the Defendant's constitutional right to a fair and impartial trial. And I would submit that any potential bias … from a face covering that probably nobody even noticed would be completely diminished by an officer wearing a uniform with a badge and a firearm."

A few moments later, the following colloquy occurred among the court, defense counsel, and the prosecutor:

> THE COURT: Well, is there any -- I mean, is there any law that you're aware of that distinguishes between the sheriff's office employees and a member of the general public wearing something -- let's assume, for the sake of argument it's a political statement, I think that's only one possible interpretation. I don't think it's the -- by any means, the only interpretation. But is there any law that you're aware of that distinguishes between their ability to express a political -- I mean, the case law is pretty clear that the courthouse is a public forum and that it's -- political speech is constitutionally protected and any regulation to limit it has to be narrowly tailored to serve a compelling government interest.
>
> [DEFENSE COUNSEL]: True.
>
> THE COURT: Is there anything that you're aware of that says that they are in any different position than anybody else coming in the courthouse?
>
> [PROSECUTOR]: Judge, the law that I'm aware of, … comes down to whether or not a government agency would allow any sort of speech. So it has to allow all speech or no speech.
>
> THE COURT: Right.

The prosecutor at one point recognized that the trial court "has the authority to establish the decorum in the courtroom … to indicate that there is no bias toward any party, that everyone who is present receives a fair treatment[.]" The trial court responded:

> Well, it's the Court's ability to enforce the decorum as the Court sees fit but it has -- that has to be done within the framework of the [C]onstitution -- I

13

mean, the Court can't … set its own rules on what it thought decorum should be if that -- if those rules conflict with and contradict the Constitution.

After additional argument, the trial court delivered its ruling from the bench:

The Court's going to find that while it is, you know, arguable, it's [sic] potential that these are intended to be a political statement, there is no evidence to suggest that that's what, in fact, it is; that it's merely something that the elected sheriff of this county has purchased for whatever reason and required his deputies to wear that it -- that even if it does reach the level of being only worn for -- to make some sort of political statement, that it's protected by the First Amendment to the Constitution in a public forum and therefore the Court's going to deny the request.

## 2. Voir Dire Through Closing Arguments

At the outset of the jury selection process, the trial court explained that questioning of the prospective jurors would proceed "in two phases" to allow for social distancing. The court explained that this was necessary because "people have concerns about COVID-19 and that's understandable." The court catalogued several measures designed to protect the health and safety of those present, including maintaining six feet of separation between people, "much more frequent[]" cleaning of the courthouse, the erection of "barriers" in the courtroom, and the presence of multiple hand sanitizing stations. The court stated that "[a]ll of these steps are based on the most recent guidance we receive from public health organizations and we, again, are doing everything we can to try and insure your protection." The court then told the potential jurors: "If any of you have concerns, as we go through this process, please let the bailiff or the sheriff's deputies or one of the court staff know and we'll attempt to do everything we can to address them."

Voir dire then proceeded. As required, the trial court asked the prospective jurors questions designed to reveal bias in favor of or against law enforcement. After completing

14

strikes for cause, the trial court adjourned the proceedings for the day. Jury selection resumed the next morning, October 15, 2020, with the parties exercising peremptory challenges. The trial court directed each remaining potential juror, in turn, to walk to the front of the room, stand in the witness box, and lower their face mask for a few seconds so that the parties could see their full faces. The first potential juror who was acceptable to both parties – and who therefore was going to serve as a juror – was instructed by the trial court to "follow the bailiff," who showed the juror where to sit in the jury box. The trial court similarly told most of the other accepted jurors to "follow the bailiff" as they took their seats. In several of those instances, while directing the particular juror to follow the bailiff, the trial court also asked the juror to put their mask back on.[32]

After the jury was sworn, the trial court gave preliminary instructions. As part of that presentation, the court told the jurors:

> After the attorneys make opening statements, each of you will be given a notepad and a pencil to use to take notes during the evidence portion of the trial. Please write your juror number and nothing else on the first page of the notepad. At the end of the day, if we go into a second day, and that's not anticipated at this point, the bailiff will collect the notepads and no one will be permitted to read them.

In addition, the trial court instructed the jurors:

> There may be public interest in this case and news coverage or other discussion of it. For that reason, do not read any article or any other report or watch or listen to any television or radio news reports about the case. If

---

[32] For example, the court told one juror: "Sir, follow the bailiff, please. And you can put your mask back up." In another instance, the court told a juror: "Ma'am, you can put your mask on and follow the bailiff there." To another of the accepted jurors, the trial court said: "Sir, you can put your mask back on and follow the bailiff there and he'll tell you where to sit." The record reflects that trial court was vigilant in ensuring that everyone in the courtroom complied with the mask mandate.

anything occurs contrary to these instructions, please write a note and give it to the bailiff as soon as possible.

Further, the court told the jurors that they should

not express any views, comments or opinions about the case to anyone. And if anyone does try to communicate with you or if you inadvertently overhear something, again, make sure that you write a note or communicate that to your forelady and she can communicate it to the bailiff or one of the courtroom personnel.

After a hearing on a motion outside the presence of the jury, the parties delivered their opening statements and the State presented its case-in-chief. The State's first witness was the alleged victim, L.H., whose testimony was interrupted by the lunch recess. When the case resumed after lunch, the trial court told the attorneys:

And I'll just note for you all. The bailiff did indicate to me that the alternate juror was saying he was having some difficulty hearing [L.H.]. So I'm going to remind her again to get up in the microphone or maybe the microphone should be lowered so it's coming out the bottom of the mask.

L.H. then completed her testimony for the State, after which the State called the State Police trooper who had responded to the scene of the alleged assault on L.H. After the State rested, the defense recalled L.H. She was the sole witness in the defense's case. After the parties concluded their presentations of evidence, the trial court instructed the jury. At the outset of those instructions, the court said:

Ladies and gentlemen, the time has come for me to instruct you as to the law that you are to apply in this case. I'm going to read through -- the bad news is you have to listen to me read through all of these instructions. The good news is I don't expect you to remember them all so I send back with the jury a copy of the instructions. So if you need to or want to refer to them during your deliberations, you have them back there with you. If you do have any questions during your deliberations, I would ask you to knock on the door -- have your forelady knock on the door and the bailiff will have a form that he

16

will hand to the forelady so you can fill out with the question that you have and that'll be presented back to the bailiff, then delivered to the Court.

After closing arguments, the court again told the jurors that, if they had any questions, they should "knock on this door -- there are going to be two doors to this room which is unusual for a jury room. If you have any questions, knock on this door here in the courtroom. That's where the bailiff will be in the courtroom." The trial court also stated that it was "going to put one of the deputies on the other door just to make sure that nobody is bothering you." Soon afterwards, the trial court directed the clerk to "swear the bailiffs," explaining that "we need to swear both of you since you're both on the door. Another first."

### 3. Verdict and Sentence

The jury deliberated for approximately 45 minutes before reaching its verdict. The jury found Smith guilty of second-degree assault and second-degree child abuse by a custodian. The jury acquitted Smith of first-degree child abuse and reckless endangerment.[33]

On January 4, 2021, the trial court sentenced Smith to 15 years of imprisonment for second-degree child abuse, with all but five years suspended, and five years for second-degree assault, to run concurrently, to be followed by a five-year term of probation. Smith timely noted an appeal.

---

[33] In addition, the trial court entered a judgment of acquittal on a count charging Smith with first-degree assault, and the State's Attorney dismissed the charge of second-degree child abuse by a household member by entering a *nolle prosequi* in open court.

## C. Appeal

The Court of Special Appeals affirmed Smith's convictions, holding that the display of the thin blue line flag did not violate Smith's right to a fair trial. *Smith v. State*, 253 Md. App. 25, 44 (2021). The intermediate appellate court stated that the trial court was incorrect when it said that a courtroom is a public forum for purposes of the First Amendment. *Id.* at 35-36. To the contrary, it is a nonpublic forum and, as such, "the government has much more flexibility to craft rules limiting speech" in a courtroom. *Id.* at 36 (internal quotation marks and citation omitted).

Whether or not the trial court's reliance on the bailiff's First Amendment rights was incorrect, the intermediate appellate court concluded that "the bailiff's wearing of the 'thin blue line' mask in the courtroom was not so inherently prejudicial as to deprive Smith of a fair trial." *Id.* at 35. The court acknowledged that the thin blue line flag "is perceived by many as a racist symbol antithetical to the Black Lives Matter Movement." *Id.* at 40. However, the court noted that others "perceive the 'thin blue line' flag to be a general symbol of support of law enforcement or pride in policing." *Id.* The court reasoned that, because "the symbol of the 'thin blue line' flag does not have one generally accepted meaning but instead is interpreted as meaning a variety of different things," the "context in which the 'thin blue line' face mask was displayed in this case must be considered." *Id.* at 43-44. The court continued:

> Specifically, the "thin blue line" flag at issue in this case appeared on the face mask of a uniformed and armed law enforcement officer serving as a courtroom bailiff. Inasmuch as the "thin blue line" flag is seen by some as a symbol of general support for law enforcement, a reasonable juror may have inferred that the law enforcement officer wearing the "thin blue line" flag

face mask was doing so in order to display his pride in being a law enforcement officer.

*Id.* at 44 (footnotes omitted). For this reason, the Court of Special Appeals "reject[ed] Smith's inherent prejudice argument and [held] that the wearing of a 'thin blue line' flag face mask by a uniformed courtroom bailiff did not constitute inherent prejudice depriving Smith of his right to a fair trial." *Id.*

However, the Court of Special Appeals made clear that its holding was not an endorsement of the display of the thin blue line flag in courtrooms:

> We are mindful to make explicit what this opinion does not hold. We do not suggest that a bailiff wearing a "thin blue line" flag face mask is a good practice, nor do we suggest that prejudice can *never* arise in different circumstances in which *actual prejudice* rather than *inherent prejudice* is alleged. Indeed, a litigant may have a reasonable argument that a bailiff wearing a "thin blue line" flag face mask caused *actual prejudice* in a case involving, for example, allegations of excessive force or other misconduct by a law enforcement officer, or in a case in which a law enforcement officer's credibility is weighed against that of a layperson. Our opinion in this case does not foreclose such an argument. Furthermore, a prohibition on the wearing of "thin blue line" symbols by courthouse staff may be a prudent prophylactic measure to avoid issues on appeal, as well as to err on the side of caution to ensure litigants' right to a neutral and fair tribunal. Here, however, we do not deal with allegations of actual prejudice. Our holding, therefore, is limited to the inherent prejudice argument raised in this case[.]

*Id.* at 44-45 (emphasis in original).

Smith filed a petition for *certiorari*, in which he asked this Court to decide the following question: "In a reported case of first impression, did the Court of Special Appeals wrongly hold that the courtroom bailiff's face mask depicting the 'thin blue line' was not

inherently prejudicial to Petitioner?" On February 9, 2022, we granted Smith's petition. *Smith v. State*, 477 Md. 382 (2022).[34]

### III

### Standard of Review

Whether the display of the thin blue line flag mask was inherently prejudicial presents a question of law, which we review *de novo*. *See, e.g.*, *State v. Robertson*, 463 Md. 342, 358 (2019). We also review constitutional claims, such as Smith's claim based on the Sixth Amendment, *de novo*. *See, e.g.*, *Vigna v. State*, 470 Md. 418, 437 (2020).

### IV

### Discussion

Smith argues that the bailiffs' display of the thin blue line flag on their face masks in the courtroom was inherently prejudicial and therefore violated his Sixth Amendment right to a fair trial. He contends that the thin blue line symbol posed an unacceptable risk of impermissible factors coming into play because it injected bias into his trial. According to Smith, at the very least, the thin blue line symbol conveyed general support for law enforcement. However, Smith argues that it also could have been interpreted by jurors as presenting a "loyalty test," which effectively asked jurors: "[W]hich side are you on? Do you stand with civilized society, or the criminal element?" Or, Smith observes, the jurors could have interpreted the display of the thin blue line symbol as expressing support for

---

[34] In his petition for *certiorari*, Smith also sought review of a question concerning the State's rebuttal closing argument. We did not include that question in the writ of *certiorari* that we issued.

20

white supremacy. According to Smith, all of the possible interpretations of the thin blue line symbol communicate biases that fundamentally detract from the neutrality and impartiality essential to a criminal trial. Smith further contends that the fact that the symbol was worn by the bailiffs – officers of the court – increased the risk that the jurors would decide the case based on bias, rather than on the evidence presented to them, because the jurors would conclude that the court approved of the messages conveyed by the thin blue line symbol.

The State, on the other hand, contends that the multiple meanings a juror could draw from the thin blue line flag dooms Smith's claim because a finding of inherent prejudice requires that a courtroom practice convey one clear and unmistakable message that comments on the particular defendant's case. According to the State, if the jurors noticed the symbol at all, they most likely would have seen it as expressing pride in law enforcement, which would not undermine Smith's right to a fair trial. In this regard, the State observes that a uniformed bailiff does not hold the same place of authority as a trial judge presiding over the case. Thus, according to the State, while a judge wearing a pro-law enforcement message in a criminal trial would be problematic, a bailiff can wear a symbol expressing pride in their profession without infringing on a defendant's right to a fair trial. Any concern about the jurors being swayed by such a pro-law enforcement message, the State says, is ameliorated by the fact that the jurors were screened for pro-law enforcement bias during voir dire.

Finally, the State contends that Smith failed to create a detailed enough record to establish inherent prejudice. According to the State, the record reveals little about what

21

jurors actually saw. For example, Smith failed to make a record of the specific location where the bailiffs were positioned in the courtroom. In the absence of such a record, the State contends, Smith cannot show that there was an unacceptably high risk of the jurors receiving any of the messages that the thin blue line flag may have conveyed.

We agree with Smith. The thin blue line flag conveys a pro-law enforcement message that bears on the criminal justice system. As such, it has no place in the courtroom in a criminal trial. We conclude that the display of the flag was inherently prejudicial in this case because it was court agents who wore the symbol and because of the fraught national atmosphere concerning policing at the time Smith's trial went forward.

## A. The Right to a Fair Trial and Inherent Prejudice

The right to a fair trial is guaranteed by the Sixth Amendment to the United States Constitution, as incorporated against the States by the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 148-49 (1968). "The Sixth Amendment's guarantee of a fair trial and impartial jury is the touchstone of our justice system." *Hunt v. State*, 345 Md. 122, 146 (1997) (footnote omitted); *see also Estelle v. Williams*, 425 U.S. 501, 503 (1976) (right to a fair trial is a "fundamental liberty secured by the Fourteenth Amendment"). A fair criminal trial requires that the jurors "be without bias or prejudice for or against the defendant and that their minds be free to hear and impartially consider the evidence and render a fair verdict thereon." *Hunt*, 345 Md. at 146.

Events or practices that inject outside influences into the courtroom, if sufficiently prejudicial, can violate a defendant's right to a fair trial. A finding either of actual prejudice or inherent prejudice is sufficient to demonstrate a violation of the Sixth Amendment. To

22

prove actual prejudice, the defendant must show some actual prejudicial effect on the jurors based on what transpired in the courtroom. *See, e.g.*, *Irvin v. Dowd*, 366 U.S. 717, 727-28 (1961) (describing how, in a rural community, substantial pretrial publicity in a murder case actually prejudiced the defendant's right to a fair trial).

A showing of inherent prejudice does not require proof that the complained-of practice actually affected the jurors' decision-making process. As the Supreme Court has stated, "[t]he actual impact of a particular practice on the judgment of jurors cannot always be fully determined." *Williams*, 425 U.S. at 504. Yet, there is "no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny." *Id.* "Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience." *Id.* A defendant establishes inherent prejudice if the defendant shows that the challenged practice presented "'an unacceptable risk … of impermissible factors coming into play.'" *Holbrook v. Flynn*, 475 U.S. 560, 570 (1986) (quoting *Williams*, 425 U.S. at 505). This is a difficult showing to make. *Hill v. Ozmint*, 339 F.3d 187, 199 (4th Cir. 2003).

Several of the leading inherent prejudice cases have concerned whether courtroom decorum or security measures posed an unacceptable risk that the jurors would make judgments based on factors outside of the evidence. In *Estelle v. Williams*, the defendant was unable to post bail and therefore was in custody. He wore prison-issued clothing throughout his trial. *See Williams*, 425 U.S. at 509-11. He argued to the Supreme Court that his prison garb had effectively marked him as guilty in the eyes of the jury, thereby infringing on the presumption of innocence. *See id.* at 503-04. The Court agreed that

prison-issued clothing would be a "constant reminder of the accused's condition," and that it was "so likely to be a continuing influence throughout the trial that … an unacceptable risk is presented of impermissible factors coming into play." *Id.* at 504-05. The Court also explained that, unlike shackles used to restrain a disruptive defendant, requiring a defendant to go to trial in prison clothing does not further an essential state policy. *Id.* at 505. Nevertheless, the Court affirmed the judgment of conviction because the defendant failed to object at trial to wearing the prison-issued clothing. *See Williams*, 425 U.S. at 512-13.

In *Holbrook v. Flynn*, six defendants were tried together for allegedly robbing a bank. *Holbrook*, 475 U.S. at 562. As the proceedings began, four uniformed state troopers sat in the spectator's section behind the bar directly behind the defendants. *Id.* Defense counsel objected that the uniformed officers "would suggest to the jury that the defendants were of 'bad character.'" *Id.* at 563. The trial court ruled that the defendants would not be prejudiced by these state troopers sitting behind the bar, and in any event, voir dire would reveal whether the potential jurors were likely to draw adverse inferences from the troopers' presence, effectively guaranteeing that the defendants received a fair trial. *See id.*

After jury selection was completed, the trial court gave its final ruling on Holbrook's objection. *Id.* at 565. The court found that there was a valid security reason to have the troopers there and noted that 51 of 54 prospective jury members had stated that there was no "inference of guilt" associated with the trooper's presence; the remaining three had not precisely answered the question. *Id*. Concluding that the presence of the troopers would not affect the defendants' ability to receive a fair trial, the trial court overruled Holbrook's

24

objection, and the trial began. Three defendants were acquitted; Holbrook and two others were convicted. *Id.*

After the Supreme Court of Rhode Island affirmed the convictions, Holbrook sought habeas corpus review in federal court. Eventually, his habeas petition was considered by the Supreme Court. The Court acknowledged the requirement under the Sixth Amendment that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Id.* at 567 (internal quotation marks and citation omitted). However, not "every practice tending to single out the accused from everyone else in the courtroom must be struck down." *Id.* The Court observed that "jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance[.]" *Id.* Thus, the Court explained that it had "never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct." *Id.*

The Court then considered "whether the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." *Id.* at 568-69. The Court answered that question in the negative, explaining:

> The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers'

25

presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.

*Id.* at 569. The Court concluded that "'reason, principle, and common human experience' counseled against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial." *Id.* (quoting *Williams*, 425 U.S. at 504). Given the "variety of ways in which such guards can be deployed, … a case-by-case approach is more appropriate." *Id.*

The Court then applied this case-specific approach to Holbrook's case. In so doing, the Court made clear that, when considering a claim of inherent prejudice, the subjective state of mind of the jurors is not dispositive: "If a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process, little stock need be placed in jurors' claims to the contrary." *Id.* at 570 (internal quotation marks and citation omitted). This is the case because

[e]ven though a practice may be inherently prejudicial, jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused. This will be especially true when jurors are questioned at the very beginning of proceedings; at that point, they can only speculate on how they will feel after being exposed to a practice daily over the course of a long trial. Whenever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors

26

actually articulated a consciousness of some prejudicial effect, but rather whether "an unacceptable risk is presented of impermissible factors coming into play[.]"

*Id.* (quoting *Williams*, 425 U.S., at 505).

Turning to the objective consideration of the presence of the four troopers at Holbrook's trial, the Court determined that this police presence was not inherently prejudicial to Holbrook's right to a fair trial. While the Court did not "minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial," the Court could not "find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section." *Id.* at 570-71. The Court did not "believe that the use of the four troopers tended to brand respondent in [the jurors'] eyes 'with an unmistakable mark of guilt.'" *Id.* at 571 (quoting *Williams*, 425 U.S. at 518 (Brennan, J., dissenting)). Four troopers "are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings. Indeed, any juror who for some other reason believed defendants particularly dangerous might well have wondered why there were only four armed troopers for the six defendants." *Id.* The Court noted, however, that even if there was a "slight degree of prejudice attributable to the troopers' presence" at Holbrook's trial, the State had a valid basis to employ this level of security, given the need to maintain custody over the defendants, who had been denied bail as flight risks. *Id.* In this regard, the presence of the troopers behind the bar separating the defense table from the courtroom

gallery differed from the wearing of prison garb at issue in *Williams*, which did not further

any valid state interest. *See id.* at 571-72.[35]

Another context in which courts around the country have considered claims of

inherent prejudice is messaging by spectators in the courtroom. Although there has been

no Supreme Court case holding courtroom spectators' conduct to have been inherently

prejudicial to a defendant's right to a fair trial, *see Carey v. Musladin*, 549 U.S. 70, 76-77

(2006), some state courts have reached that conclusion based on the facts of the cases

before them. For example, *State v. Franklin*, 327 S.E.2d 449 (W. Va. 1985), involved the

trial of a defendant charged with driving under the influence of alcohol, resulting in death.

At Franklin's three-day trial, between 10 and 30 people, including a Sherriff in uniform,

---

[35] In a vein similar to *Holbrook*, this Court in *Bruce v. State*, 318 Md. 706 (1990), considered whether enhanced security measures employed at a criminal trial were inherently prejudicial to the defendant's right to a fair trial. There, the defendant was charged with multiple murders and other violent felonies. *Id.* at 711. There was "enhanced security" at Bruce's trial, including armed guards around and on the roof of the courthouse, new metal detectors, and a deputy sheriff posted close to the defendant in the courtroom, as well as other uniformed and plainclothes officers elsewhere in the courtroom. *See id.* at 716, 720-22. With respect to the security measures outside the courtroom, the Court held that Bruce "failed to establish any unacceptable risk of prejudice from the limited description, on the record," of those protocols. *See id.* at 719-20. The Court concluded that "[t]he inferences to be drawn from the security measures outside the courtroom were not necessarily that the defendant was dangerous or untrustworthy, but could be that there was a potential for violence directed at the defendant or the witnesses in the case." *Id.* at 719.

The Court then reviewed the in-courtroom security measures. *Id.* at 720-22. The Court distinguished a heightened security officer presence in the courtroom from a defendant being shackled or wearing a prison uniform or other measures that can "create the impression in the minds of the jury that the defendant is dangerous or untrustworthy." *Id.* at 721 (internal quotation marks and citation omitted). The Court held that the courtroom security measures during Bruce's trial were not unreasonable based on the record. *Id.* at 721-22.

28

prominently displayed Mothers Against Drunk Drivers ("MADD") buttons as they sat directly in front of the jury in the courtroom. *Id.* at 454. Defense counsel repeatedly requested a mistrial or alternatively asked the court to order the removal of the MADD buttons, or the spectators wearing them, from the courtroom. *Id*. The court granted no relief. *See id.*

On appeal, West Virginia's high court noted the right of defendants and the public under its State Constitution to an "open public trial in every criminal case." *Id.* at 455. This requires balancing "the right of public access to a criminal trial" with "the constitutional right of a defendant to a fair trial." *Id.* The Court observed that "[a]n important element in this process is insuring that the jury is always insulated, at least to the best of the court's ability, from every source of pressure or prejudice." *Id.* The Court held that, in Franklin's case, the trial court had not sufficiently protected the right to a fair trial:

> In this case the spectators were clearly distinguishable from other visitors in the courtroom and, led by the sheriff, they constituted a formidable, albeit passive, influence on the jury. Indeed, the court's cardinal failure in this case was to take no action whatever against a predominant group of ordinary citizens who were tooth and nail opposed to any finding that the defendant was not guilty. This Court quite simply cannot state that the mere presence of the spectators wearing MADD buttons and the pressure and activities of the uniformed sheriff leading them did not do irreparable damage to the defendant's right to a fair trial by an impartial jury.

*Id.*; *see also Long v. State*, 151 So. 3d 498, 501-02, 505 (Fla. Dist. Ct. App. 2014) (defendant convicted of molestation and sexual battery by a person in familial or custodial authority; on appeal, convictions reversed because the presence at trial of 11-12 men wearing jackets with the insignia "Bikers Against Child Abuse" was inherently prejudicial).

29

In other instances, courts have concluded that clothing or accessories worn by spectators and other conduct by non-courtroom staff that occurred inside or outside the courtroom did not rise to the level of inherent prejudice. For example, in *People v. Ramirez*, 479 P.3d 797, 821 (Cal. 2021), *cert. denied*, 142 S. Ct. 784 (2022), the California Supreme Court rejected a claim of inherent prejudice, where approximately 18 uniformed officers appeared in the courtroom gallery on the final day of trial for a defendant charged with murdering a police officer. The Court concluded that there was a "wide range of reasonable inferences that the jury could have drawn from the officers' presence," including supporting the victim's family, and/or "show[ing] camaraderie for one another." *Id.* at 822. Although the Court stated that jurors "may be affected by the presence of uniformed police officers regardless of what they believe the officers' intentions to be," it concluded that the "risk of undue influence" from the showing of police in the courtroom was not "unacceptably high." *Id.*; *see also State v. Dillon*, 788 N.W.2d 360, 363 (S.D. 2010) (holding that a display of children's shoes in a hallway that the jury walked through did not inherently prejudice the defendant accused of raping multiple children); *Billings v. Polk*, 441 F.3d 238, 246-47 (4th Cir. 2006) (holding that there was not inherent prejudice when an alternate jury member wore a t-shirt displaying the message "No Mercy – No Limits").

We glean from the cases we have discussed above that claims of inherent prejudice are properly decided based on the unique facts and circumstances of each case. To prevail on a claim of inherent prejudice, the defendant must: (1) have objected to the challenged practice in the trial court, (2) demonstrate, based on the record of the proceeding in the trial

30

court, that the challenged practice was observable by the jury; and (3) establish that the challenged practice created an unacceptable risk that impermissible factors would come into play in the jury's determination of the case. If the defendant meets all of these requirements, the State may attempt to show that the challenged practice was necessary to further a compelling governmental interest. We now apply this case-by-case approach to this case and consider whether the bailiffs' display of the thin blue line flag on their face masks was inherently prejudicial to Smith's right to a fair trial.

## B. The Bailiffs' Display of the Thin Blue Line Flag on Their Face Masks Was Inherently Prejudicial.

1. As a Political Message Bearing on the Criminal Justice System, the Thin Blue Line Has No Place in a Criminal Trial.

Courtrooms "are a stage for public discourse, a neutral forum for the resolution of civil and criminal matters. The unique setting that the courtroom provides is itself an important element in the constitutional conception of trial, contributing a dignity essential to the integrity of the trial process." *State v. Jaime*, 233 P.3d 554, 559 (Wash. 2010) (internal quotation marks and citation omitted); *see also Allen v. Commonwealth*, 286 S.W.3d 221, 230 n.27 (Ky. 2009) ("We must remind ourselves that a courtroom is committed to being a neutral environment – a holy shrine of impartiality in its resolutions of differences, and a place dedicated to fairness and equal treatment under law[.]").

As the judicial officer presiding over the courtroom, the trial judge has the responsibility to ensure that the courtroom in every case is a venue where litigants can present evidence and juries render decisions based solely on that evidence. *See Berner v. Delahanty*, 129 F.3d 20, 26 (1st Cir. 1997) (observing that, within the "staid environment"

31

of a courtroom, "the presiding judge is charged with the responsibility of maintaining proper order and decorum. In carrying out this responsibility, the judge must ensure that the courthouse is a place in which rational reflection and disinterested judgment will not be disrupted") (cleaned up). "[I]t is beyond serious question that the proper discharge of these responsibilities includes the right (and, indeed, the duty) to limit, to the extent practicable, the appearance of favoritism in judicial proceedings, and particularly, the appearance of political partiality." *Id.*; *see also In re Elrich S.*, 416 Md. 15, 38 (2010) ("A judge must, of course, have the ability to control his or her courtroom, to assure that judicial proceedings are conducted fairly, efficiently, and with dignity and decorum.") (internal quotation marks and citation omitted).[36]

In a criminal case, the trial judge's responsibility to maintain "a neutral, politically impartial environment[] dedicated to fairness and equal treatment of litigants," *Berner*, 129

---

[36] The Court of Special Appeals held, and the parties before us agree, that a courtroom is not a public forum; therefore, the government may restrain speech in a courtroom, as long as such regulation is reasonable. *See, e.g.*, *Mezibov v. Allen*, 411 F.3d 712, 718 (6th Cir. 2005) ("The courtroom is a nonpublic forum, where the First Amendment rights of everyone (attorneys included) are at their constitutional nadir. In fact, the courtroom is unique even among nonpublic fora because within its confines we regularly countenance the application of even viewpoint-discriminatory restrictions on speech.") (citation removed); *Berner v. Delahanty*, 129 F.3d 20, 26 (1st Cir. 1997) ("A courthouse – and, especially, a courtroom – is a nonpublic forum."); *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) ("In a nonpublic forum … the government has much more flexibility to craft rules limiting speech…. The government may reserve such a forum 'for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'") (citing *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 46 (1983)). We agree. The State does not defend the circuit court's ruling on the ground that the bailiffs had the right under the First Amendment to wear the thin blue line mask during Smith's trial.

F.3d at 27, takes on Sixth Amendment significance. When political messages enter the courtroom during a criminal trial, so too does the risk that the jurors will not decide an accused's case based solely on the evidence. It is the trial judge's job to keep political and other inappropriate messages from entering the courtroom to the extent possible, and thereby ensure that there is not an unacceptable risk of impermissible factors coming into play. *See Holbrook*, 475 U.S. at 571-72.

In a criminal trial, in which the State is bringing to bear its law enforcement resources against the accused, an extraneous message of support for law enforcement is improper. It injects a pro-law enforcement variable into what should be a neutral environment, potentially adding weight to the prosecution's side of the scales based on matters that are not in evidence. Certainly, not every pro-law enforcement message in a courtroom will rise to the level of inherent prejudice. One or two people wearing Fraternal Order of Police baseball caps as they watch a criminal trial from the gallery will presumably cause less concern than 50 spectators simultaneously displaying a recognizably pro-law enforcement message. At some point along the continuum of possible pro-law enforcement messaging in a courtroom, the circumstances surrounding a particular display will cause it to cross the line from inappropriate to inherently prejudicial.[37]

---

[37] As discussed above, the State may justify a courtroom practice that conveys a prejudicial message by demonstrating that the challenged practice was necessary to further a compelling governmental interest. *See Holbrook*, 475 U.S. at 568-69; *Bruce*, 318 Md. at 721. The State has not attempted to defend the circuit court's ruling on the ground that the display of the thin blue line flag mask furthered an essential state interest. Like everyone else in the courtroom, the bailiffs were required to wear face masks in light of the COVID-19 emergency. But they could have done their part to lessen the risk of viral

33

The State argues that the display of the thin blue line flag at Smith's trial did not cross that line because it did not convey one clear, unmistakable meaning to the jurors. Although the State is correct that the thin blue line can mean different things to different people, we disagree with the State's contention that this undermines Smith's claim of inherent prejudice. None of the meanings reasonably associated with the thin blue line had any place at Smith's criminal trial.[38]

As discussed above, the thin blue line, among other things, can be viewed as expressing general support for law enforcement, or expressing the belief that police stand between civilized society and criminals, or expressing support for white supremacy. Although these messages range from benign to malevolent, none of them should be conveyed to the jury in a criminal trial. All of them risk suggesting to the jury that they should side with law enforcement. Thus, even if we assume that the jurors gave the most benign meaning possible to the bailiffs' display of the thin blue line – that the sheriff's deputies were expressing general support for, and pride in, their chosen profession of law

---

transmission just as effectively by wearing a mask that did not display the thin blue line flag.

[38] A police officer testified as a witness for the State at Smith's trial, but that circumstance is not essential to our analysis. An extraneous pro-law enforcement message would also be inappropriate at a criminal trial that did not include any law enforcement witnesses. Similarly, it is immaterial that the defense did not raise any issues involving alleged police misconduct. The credibility of a particular police officer or the validity of a particular police action need not be called into question in order for a court agent's display of a pro-law enforcement message to carry an unacceptable risk that it will influence the jurors.

enforcement – it nevertheless was an inappropriate message to convey to the jury in a criminal trial.[39]

The question we therefore must decide is: was the display of the thin blue line symbol at Smith's trial merely inappropriate, or did it rise to the level of inherently prejudicial to Smith's right to a fair trial? We conclude that the display of the thin blue line flag was inherently prejudicial because it was the bailiffs who conveyed the message, and because the thin blue line symbol was particularly evocative in the immediate aftermath of the protests and counter-protests that occurred in 2020.[40]

---

[39] In this regard, this case is distinguishable from *Holbrook*, where some of the possible messages the jurors could have drawn from the presence of the officers behind the defendant would not have suggested that the court viewed the defendant as dangerous and that they should therefore side with law enforcement and against Holbrook when delivering their verdict. Here, the most benign of the possible messages that the jurors could have gleaned from the display of the thin blue line flag was pro-law enforcement.

[40] The State argues that, in order to establish inherent prejudice, Smith must show that "*all* the jurors … recognized the symbol and [drew] some type of meaning from it." The State cites no authority for this proposition, and we discern none in the cases we have reviewed concerning inherent prejudice. Given the nature of the inherent prejudice inquiry, we need not determine that all the jurors, or any particular percentage of the jurors, recognized the thin blue line symbol and attributed meaning to it. In analyzing inherent prejudice, a court assesses the risk of prejudice associated with a courtroom practice or message, not how a particular group of jurors actually reacted to the practice or message. As discussed above, by the time of the trial, the thin blue line was widely recognized in the United States as a pro-law enforcement symbol, and indeed was viewed as controversial and polarizing. We are not dealing here with a symbol that was invented shortly before trial and/or was not previously disseminated widely. To the extent Judge Gould is of the view that the thin blue line symbol may not have been widely recognized in the United States by October 2020 as controversial, *see* Dissent Op. at 1 n.1, we must respectfully disagree. Nor do we agree with Judge Gould's view (Dissent Op. at 1-2) that Smith needed to produce evidence "as to how the citizens of Kent County understood what the Sheriff was trying to convey with the use of such a mask." There was no information embargo in place in Kent County in the years leading up to Smith's trial in October 2020 that would have led its citizens to fail to recognize the thin blue line flag as a pro-law enforcement

2. Because the Bailiff Is an Agent of the Court, the Bailiffs' Display of the Thin Blue Line Flag Was Particularly Problematic.

Smith argues that the bailiffs' display of the thin blue line symbol heightened the potential for prejudice "because it gave the impression that the court approved of its meanings." We agree.

As the Supreme Court observed in *Parker v. Gladden*, 385 U.S. 363, 365 (1966), "the official character of the bailiff – as an officer of the court as well as the State – beyond question carries great weight with a jury[.]" Not only is the bailiff an "officer of the court," a term often associated with the attorneys who appear before it; the bailiff is an *agent* of the court. *See Turpin v. Todd*, 519 S.E.2d 678, 682 (Ga. 1999) ("The very nature of the bailiff's position serves to heighten the prejudicial potential a bailiff's communication may have on the jury."); *Lewis v. Pearson*, 556 S.W.2d 661, 664 (Ark. 1977) ("Because of the close relationship between the bailiff and the court itself any action on the part of the bailiff concerning the jury should be subject to close scrutiny by the court."); *Reynolds v. Allied Emergency Services, PC*, 193 So. 3d 625, 631 (Miss. App. 2016) (finding prejudice in civil case where erroneous jury instructions were delivered to the jury by "the bailiff – an extension of the court and trial judge – … which carrie[d] with it the imprimatur of authority") (internal quotation marks and citation omitted); *State v. Gregory*, 147 P.3d 1201, 1247 (Wash. 2006) (en banc) ("[I]n the eyes of the jury, the bailiff is an agent of the

___

symbol. In short, we are confident that the "thin blue line" was sufficiently well known as a pro-law enforcement symbol throughout the United States – including Kent County – by the time of Smith's trial to create the type of risk that supports a finding of inherent prejudice.

36

trial judge."), *overruled on other grounds by State v. W.R., Jr.*, 336 P.3d 1134 (2014); *State v. Kelley*, 451 S.E.2d 425, 430 (W. Va. App. 1994) ("Clearly, the bailiff, in his capacity as attendant to the judge, is an extension of the court."). Thus, any political message that bailiffs convey to the jury – verbally or non-verbally – in the course of performing their duties may well be imputed by the jurors to the court.[41] For this reason, the display of the thin blue line symbol by at least two bailiffs[42] carried a much greater potential for prejudice than, for example, if two spectators seated separately in the gallery of the courtroom had worn the same face masks.[43] *See* Brief of *Amici Curiae* The Public Justice Center, et al. 8-9 (citing Hon. Arthur Gilbert, *Juror Perceptions: How They Judge the Judges*, 17 Judges J. 14, 16-18 (1978), which discussed a survey of thousands of jurors, finding that "[j]udges are the ones who most directly affect the way in which jurors perceive th[e] system," and

---

[41] In this case, the symbol that the court agents conveyed was the thin blue line flag. We would reach the same conclusion concerning a court agent's display of any other symbol that creates an unacceptable risk of the jury deciding a criminal case based on impermissible factors.

[42] The record reflects that at least two Sheriff's deputies served as bailiffs for at least part of Smith's trial. Given that the Sheriff of Kent County at the time was requiring all his deputies to wear the thin blue line flag face mask, we believe the fair inference to draw is that all deputies who served as bailiffs at Smith's trial displayed the thin blue line symbol while they were in the presence of the jury. The State has acknowledged that there were multiple deputies in the courthouse during Smith's trial, and that they all displayed the thin blue line on their face masks.

[43] This is not to say that, if a trial judge notices a spectator wearing an article of clothing that the judge believes may carry a risk of prejudice to a defendant receiving a fair trial, the judge is powerless to take appropriate action.

cautioning that "court personnel" are "a direct reflection on you the judge, and consequently a reflection on the judiciary in general").[44]

The State downplays the significance of the bailiff's role as the court's agent, emphasizing that the bailiff "is not identical to the court." For example, the State observes, a "bailiff can wear a police uniform without impeding the fairness of court proceedings or signaling a 'pro-prosecution' message. The same could not be said for a judge." (Footnote omitted.) Relatedly, the State contends that there is no material distinction between a police uniform and a thin blue line flag face mask. That is, if a bailiff can wear the uniform in the courtroom without running afoul of the Sixth Amendment, it should follow that the thin blue line symbol is permissible as well.

We are confident that jurors view wearing a uniform as normal for a security officer and think nothing of it. What is not normal is adding a controversial political symbol to an officer's clothing or accessories. The same juror who would give no thought to seeing a

---

[44] In his Dissenting Opinion, Judge Gould seems to suggest that this Court can, by rule, dictate that Sheriff's deputies – when acting as bailiffs – not display political messages on their persons, but that a trial judge may not do so. *See* Dissent Op. at 1, 8. As the judicial officer responsible for ensuring that a defendant receives a fair trial and for maintaining proper decorum in the courtroom generally, a trial judge has the authority to direct a bailiff not to display a political message in court, even if the bailiff is doing so at the direction of a sheriff. *Cf.* Opinion Letter to the Honorable Paul H. Weinstein, 78 Md. Op. Atty. Gen. 103 (Md. A.G.), 1993 WL 340439, at *3 (Mar. 15, 1993) (Attorney General of Maryland opining that County Administrative Judge may require the State's Attorney and the State's Attorney's staff to comply with courthouse security procedures, despite the State's Attorney's status as a constitutionally established office separate from the Judiciary).

bailiff in uniform might well notice and attribute meaning to a bailiff wearing a political symbol on their clothing or elsewhere on their person.[45]

The State also contends that the bailiffs did not intend to comment on Smith's case through their donning of the face masks. Assuming that is true, it is of no moment. We are not concerned here with the bailiffs' subjective intent in conveying a particular message, or for that matter, with the Sheriff's intent in requiring his deputies to wear the masks,[46] but rather with the potential effects of the jurors' receipt of any of the improper messages presented by the thin blue line symbolism as displayed on the bailiffs' masks. As discussed, none of the messages conveyed by the thin blue line flag mask had any place in a criminal courtroom.[47]

---

[45] We disagree with Judge Gould's assessment that, because the Sheriff of Kent County is an elected official, the jurors would not view his deputies as agents of the court while they served as bailiffs. *See* Dissent Op. at 5. It is clear from the record that the jury understood from the court's instructions that the bailiffs were to be the intermediaries between themselves and the court. The court told the jurors that, if they had any questions or concerns during the course of the trial, they should notify the bailiffs. It was equally clear to the jurors that the bailiffs were following the instructions of the trial court. We have no doubt that the jurors understood the bailiffs to be the court's agents. And, indeed, the deputies were the court's agents while performing their duties as bailiffs.

[46] We pause to note that we in no way ascribe any nefarious motive to the Sheriff in directing his deputies to wear the thin blue line flag mask. In addition, nothing in this opinion should be interpreted as indicating that we fail to appreciate the immense challenges that the trial court faced in October 2020 when it presided over Smith's trial.

[47] During oral argument, Smith's attorney indicated that a trial court may consider the State's objection to the display of a symbol that threatens to undermine the neutrality of the courtroom and, consequently, the fairness of the proceedings. We agree.

39

3.  The Display of the Thin Blue Line Flag in a Criminal Trial Was Particularly Problematic in Late 2020.

The risk of impermissible factors coming into play at Smith's trial was heightened because of the moment in time when the trial occurred. As discussed above, Smith's trial went forward in the immediate aftermath of George Floyd's murder, large protests in support of BLM, and pro-police counter-protests. Some of these protests led to violence.[48] With movements to "defund the police" in full swing, many law enforcement officers felt that they themselves and their profession were under attack.[49] Additionally, a survey of nearly 200 departments by the Police Executive Research Forum showed a 45% increase in the retirement rate and 18% increase in resignations during the 12-month period between April 2020 and March 2021, when compared to the same period a year earlier.[50]

We cannot ignore the "contemporary climate" when evaluating a claim of inherent prejudice. In this regard, *Wiggins v. State*, 315 Md. 232 (1989), *abrogated on other grounds*

---

[48] *See* Kim and Wilson, *supra* note 10 (reporting on violent clashes between BLM and Blue Lives Matter protestors in New York City); Derek Bryson Taylor, *George Floyd Protests: A Timeline*, N.Y. TIMES (Nov. 5, 2021), available at https://perma.cc/2XZZ-3L5T (noting that "at least six people have been killed in violence connected to the protests that started after Mr. Floyd died in police custody").

[49] Neil MacFarquhar, *Why Police Have Been Quitting in Droves in the Last Year*, N.Y. TIMES (June 24, 2021), available at https://perma.cc/KM5Q-RVU3; Russonello, *supra* note 8. Morale in some police departments in the months following Floyd's killing was reported to be low. *See, e.g.*, Benjamin Fearnow, *Several Minneapolis Police Officers Quit Amid Lack of Support, Low Morale Following George Floyd's Death*, NEWSWEEK (June 14, 2020), available at https://perma.cc/7PP6-KCAY; Eric Westervelt, *Cops Say Low Morale And Department Scrutiny Are Driving Them Away From The Job*, NPR (June 24, 2021), available at https://perma.cc/6GU7-HL7P.

[50] *Survey on Police Workforce Trends*, Police Executive Research Forum (June 11, 2021), available at https://perma.cc/7EU6-7DPQ.

*by Horton v. California*, 496 U.S. 128 (1990), is instructive. Wiggins went to trial in 1987, near the height of the AIDS epidemic. The State alleged that Wiggins robbed and murdered a would-be lover whom he had met that same evening. 315 Md. at 235-36. In voir dire, the trial judge told prospective jurors that the case had "touches of homosexuality in it," and asked if that would prevent anyone from deciding the case fairly and impartially. *Id.* at 241. The jury heard evidence indicating that Wiggins was gay. After the victim was introduced to Wiggins at a bar, the victim, Wiggins, and the person who introduced them went to Wiggins's residence to engage in a sexual encounter. *See id.* at 235. Wiggins attacked and eventually murdered the victim. *Id.* at 235-36.

When Wiggins's case came to trial in November 1987, guards escorted Wiggins into the courtroom wearing rubber gloves. The jury was present and, thus, would have been able to observe that the guards were wearing gloves as they walked next to Wiggins. *See id.* at 236. Defense counsel objected to this procedure. *Id.* On the second day of trial, Wiggins was brought into the courtroom before the jury was seated, but the guards continued to wear rubber gloves after they took their position immediately behind Wiggins. *Id.* at 237. Defense counsel again objected, arguing that allowing the jurors to see the gloved guards near Wiggins could lead the jurors to draw inferences about Wiggins, which would have "adverse effects" on Wiggins's rights. *Id.* at 237-38. The trial court denied Wiggins's motion for a mistral, and Wiggins was convicted. *Id.* at 238. At a hearing on Wiggins's motion for a new trial, his counsel argued that "Mr. Wiggins being paraded back and forth in front of the jury with the deputies wearing gloves, I believe that procedure in

41

and of itself was so inherently prejudicial as to deprive him of a fair trial in this case." *Id.*

The trial court denied the motion for a new trial. *Id.*

> Citing *Estelle v. Williams*, *id.* at 239-40, this Court reversed:
>
> We believe that the jury, viewing the officers guarding Wiggins, would not be without curiosity as to the guards' protective attire. We think that it is not improbable that the jury would assume, in light of the widespread and continuous publicity devoted to AIDS, that Wiggins was infected with the disease. We are of the opinion that the wearing of the gloves, without a sound basis shown for doing so, undermined the fairness of the fact-finding process and diluted the principle that guilt is to be established by probative evidence beyond a reasonable doubt.

*Id.* at 244. The Court reached this conclusion, in large part, due to the climate of fear surrounding AIDS that was then gripping the country:

> It is not a big step in logical inference, considering the contemporary climate, from seeing the guards protected in their contact with the defendant to the thought that he might have AIDS. The error was not cured by the voir dire question. It is a far cry from not being prejudiced because the case "has touches of homosexuality in it," and not being prejudiced because the defendant may have AIDS. Inquiry with respect to the latter was not made.[51]

---

[51] In this case, the trial court asked voir dire questions designed to reveal bias in favor of law enforcement. The State argues that this undermines Smith's inherent prejudice claim to the extent it is based on the jurors having received an extraneous pro-law enforcement message. We disagree. It is not the case that, having screened jurors for pro-law enforcement bias, the court's decision to conduct the trial with court agents displaying a pro-law enforcement message is insulated from constitutional scrutiny. As the Supreme Court recognized almost 40 years ago in *Holbrook v. Flynn*, "[e]ven though a practice may be inherently prejudicial, jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused." 475 U.S. at 570. "Whenever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether an unacceptable risk is presented of impermissible factors coming into play." *Id.* (internal quotation marks and citation omitted); *see also* Cecelia Trenticosta & William C. Collins, *Death and Dixie: How the Courthouse Confederate Flag Influences Capital Cases in Louisiana*, 27 Harv. J. Race & Ethnic Just. 125, 150 (2011) (advocating that, similar to cases like *Parker v. Gladden*, which "address[] the impact of perceived authority on the *conscious* decisionmaking processes, … [d]isplays that impact

42

The reason why the guards wore gloves in this particular case was left to the speculation of the jury. Regardless of the credence the jury gave the testimony of the witnesses, or how it weighed the evidence, it is not far-fetched that the jury, observing the gloves, thought it better, in any event, that Wiggins be withdrawn from public circulation and confined in an institution[.]

*Id.* at 244-45.

In this case, as in *Wiggins*, the "contemporary climate" is important to our decision. In October of 2020, the country was on edge, having just lived through Floyd's murder and the unrest that followed. The thin blue line symbol, already controversial, had become even more polarizing to many.[52] Calls to "defund the police" were being made across the nation.[53] Against this backdrop, the bailiffs' display of the thin blue line flag on their face masks in the courtroom during Smith's trial created an unacceptable risk that the jurors would believe that the court was siding with law enforcement in this moment of political upheaval, and that they would necessarily have that belief in their minds as they decided whether to side with law enforcement in this particular case.

---

decision-making through subconscious channels should likewise be treated as inherently prejudicial where their effect is heightened by perception of authoritative status").

[52] *See, e.g.*, Joe DiFazio, *Dividing line: thin blue line flag source of division on South Shore*, THE PATRIOT LEDGER (Aug. 21, 2020), available at https://perma.cc/FBC3-5Y42; Rita Oceguera, *In Mount Prospect, a village divided over the 'thin blue line,'* INJUSTICE WATCH (Sept. 2, 2021), available at https://perma.cc/A3HY-4DS6; Lauren Frias, *The 'Thin Blue Line': How a simple phrase became a controversial symbol of the police*, INSIDER (Feb. 24, 2021), available at https://perma.cc/3VRU-3KRJ.

[53] Dionne Searcey, *What Would Efforts to Defund or Disband Police Departments Really Mean?*, N.Y. TIMES (June 8, 2020), available at https://perma.cc/DS52-B2B2; Sarah Holder, *The Cities Taking Up Calls to Defund the Police,* BLOOMBERG (June 9, 2020), available at https://perma.cc/8T74-TLW9.

4. The Record Is Sufficient to Establish Inherent Prejudice in This Case.

The State argues that the record is insufficient to support a finding of inherent prejudice. In particular, the State cites to the Court of Special Appeals' observation that "there is nothing in the record about … the specific location where the bailiff was positioned in the courtroom[.]" *Smith*, 253 Md. App. at 44 n.7. According to the State, "[t]his was a question of paramount importance given that the bailiff would not generally be 'interacting' with the jury during the bulk of the trial but simply standing or sitting in place."

In our view, the record is sufficient to find inherent prejudice in this case. True, defense counsel could have taken steps to document the size of the courtroom, measure the distance between the position(s) where the bailiff stood during the presentation of evidence and the jury box, etc. However, we are satisfied that the jury had ample opportunity to view the thin blue line flag on the faces of the bailiffs throughout the two-day trial. The trial judge was vigilant about ensuring that all present in the courtroom wore face masks. Thus, we can safely infer that the bailiffs wore their thin blue line flag masks throughout the trial. Moreover, the trial court directed the jurors' attention to the bailiff(s) many times during the trial. Among other things, after a juror was pronounced "acceptable" by both parties during jury selection, the juror was told to "follow the bailiff right there." On several occasions, that direction was coupled with a request that the jurors put their own masks back in place. The trial court's explicit focus on masks in the courtroom was commendable in light of the public health emergency, but it also increased the likelihood that the jurors would pay attention to the masks worn by others in the courtroom.

44

The trial court also referenced the bailiffs on multiple occasions after the jurors were seated. In its preliminary instructions, the court told the jurors that the bailiff would collect their notepads from them. At one point during the trial, the bailiff delivered a message from the alternate juror to the court that he was having difficulty hearing the proceedings. During jury instructions, the court informed the jury that if they had any questions they should "have your forelady knock on the door and the bailiff will have a form that he will hand to the forelady so you can fill out with the question that you have and that'll be presented back to the bailiff, then delivered to the Court." The court also told the jury where the two bailiffs would be positioned while the jury was deliberating. And, immediately prior to deliberating, the jurors saw the bailiffs being sworn.

The State points out that everyone was wearing a face mask in the courtroom and posits that a more detailed record is necessary to know whether the jurors were more likely to notice and pay attention to the particular masks that the bailiffs wore, as opposed to the masks that the jurors saw on each other and on witnesses and others in the courtroom. We disagree. What the authority figures in the courtroom chose to display on their face masks was likely to be of particular interest to the jurors. Those authority figures were the judge and the bailiffs. Undoubtedly, one of the reasons the Sheriff of Kent County decided to require his deputies to wear this particular mask was because he expected that members of

the public would take notice. We have every reason to believe that the jury in Smith's trial did just that.[54]

**V**

**Conclusion**

The trial judge is responsible for maintaining the courtroom as a neutral venue for the fair resolution of disputes. To that end, the court must strive to ensure neither side of the scale receives extra weight from the display of a political message (or any other kind of extraneous message) in the courtroom. In a criminal case, a defendant's Sixth Amendment right to a fair trial requires that the jury decide the defendant's guilt based only on the evidence before it. When a court agent displays a political message during a criminal trial, the fairness of the process is jeopardized. If the display of the message creates an unacceptable risk that the jury will decide the case based on impermissible factors, a reviewing court will conclude that the display was inherently prejudicial to the defendant's right to a fair trial. In this case, the bailiffs' display of the thin blue line flag on their face masks inherently prejudiced Smith's right to a fair trial. We therefore reverse the judgment

---

[54] We note that several months after Smith's trial concluded, the Chief Judge of the District Court of Maryland, the Honorable John P. Morrissey, instructed District Court judges and staff not to wear face masks or other apparel that display the "thin blue line." Chief Judge Morrissey stated that "[e]mployees of the District Court wearing any clothing item or apparel which promotes or displays a logo, sticker, pin, patch, slogan, or sign which may be perceived as showing bias or favoritism to a particular group of people could undermine the District Court's mission of fair, efficient, and effective justice for all and call into question the Judiciary's obligation to remain impartial and unbiased." Cameron Jenkins, *Maryland District Court chief judge bans 'thin blue line' masks over bias concerns*," THE HILL (May 6, 2021), available at https://perma.cc/3ZV3-BPYE.

of the Court of Special Appeals and direct that the case be remanded to the circuit court for

a new trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH THE INSTRUCTION TO FURTHER REMAND THE CASE TO THE CIRCUIT COURT FOR KENT COUNTY FOR A NEW TRIAL; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY KENT COUNTY.**

IN THE COURT OF APPEALS

OF MARYLAND

No. 61

September Term, 2021

_____

EVERETT SMITH

v.

STATE OF MARYLAND

_____

Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,
Getty, Joseph M.
   (Senior Judge, Specially Assigned),

JJ.

_____

Dissenting Opinion by Gould, J.,
 which Getty, C.J. joins

_____

Filed: August 26, 2022

Although I agree with the Majority that the courtroom should be a neutral venue devoid of political or other ideological messages, and I would support amending the Maryland Rules to ensure that the circumstance presented here never repeats itself, I nevertheless respectfully dissent.

Under the guise of a de novo review of a question of law, the Majority takes the liberty of making factual findings as to the various meanings associated with the thin blue line face mask and the controversy surrounding its use. In doing so, the Majority relies on news articles and commentary from the New York Times, L.A. Times, Politico, and other sources from around the country, some of which were published after Mr. Smith's trial. Noticeably missing from the Majority's analysis is any reference to news coverage in Kent County, or *any* evidence for that matter, regarding how the thin blue line mask was perceived there. At any rate, regardless of when these articles were published, the more significant problem I have with the Majority's reliance on these materials is that none of them were put before the trial court.[1]

In fact, no evidence was put before the trial court. There was no testimony from the Sheriff, the Sheriff's deputy, or anyone else about what, if anything, the Sheriff intended

---

[1] Even if these materials had been put before the trial court, I don't agree that they establish that, as argued by the Majority, "the thin blue line was widely recognized in the United States as a pro-law enforcement symbol, and indeed was viewed as controversial and polarizing." *Smith v. State*, No. 61, Sept. Term 2021, op. at 35, n.40 (Md. Aug. 26, 2022). With due respect to the hardworking journalists and commentators at the New York Times and elsewhere, their reporting that something is widely recognized or widely controversial does not make it so. To be clear, I am not saying that the thin blue line flag *was* or *was not* controversial or widely recognized—I am simply saying that the record in this case doesn't support either conclusion.

to convey by ordering his deputies to wear the thin blue line face mask. There was no evidence as to how the citizens of Kent County understood what the Sheriff was trying to convey with the use of such a mask. And there was no evidence before the trial court showing how the thin blue line flag was perceived elsewhere in this country. Meanwhile, the trial court was navigating uncharted territory with the re-opening of Maryland trial courts and implementing the various masking, social distancing, and other safety measures that complicated almost every aspect of the courts' proceedings. Framing the issue as a question of law does not relieve us of our obligation to conduct our review based on the contents of the record.

There is a proper way to put such issues before a trial court, and Mr. Smith did not follow it. The correct way is set forth in Maryland Rule 4-252, which governs motions practice in the circuit court. Relevant here, subsection (d) states that a motion or request "capable of determination before trial without trial of the general issue, shall be raised by motion filed at any time before trial." Also relevant is subsection (e), which states that "[a] motion filed pursuant to this Rule shall be in writing unless the court otherwise directs, shall state the grounds upon which it is made, and shall set forth the relief sought. . . . Every motion shall contain or be accompanied by a statement of points and citation of authorities."

This Rule was designed to provide both the court and opposing party with the time and information necessary to address the issues raised by the motion. Mr. Smith acknowledged addressing the issue with unnamed individuals on behalf of the State and the court in the preceding week, yet failed to comply with these timing and writing

requirements. Mr. Smith also failed to support his motion with any evidence, and instead relied solely on the *ipse dixit* of his counsel. I am not calling a technical foot fault here. In the absence of any evidence in the record establishing any risk, let alone an unacceptable risk, of impermissible factors coming into play, I fail to see how this Court can hold that the trial court erred as a matter of law in declining to order the deputy Sheriff to change his face mask.

What Mr. Smith was asking the court to do—order the deputy Sheriff to defy the order of his superior officer by wearing a different face mask—was no small thing. As we stated in *Soper v. Montgomery Cnty.*, 294 Md. 331, 337 (1982):

> Article IV, § 44 of the Maryland Constitution provides that there shall be an elected sheriff in each county and Baltimore City who shall "exercise such powers and perform such duties as now are or may hereafter be fixed by law." Thus, sheriffs are constitutional officers whose powers and duties are not expressly enumerated in the Constitution. Rather, those powers and duties are prescribed by the common law as modified by the Acts of the Legislature. Accordingly, sheriffs retain their common law powers and duties until deprived of them by the Legislature.

(citations omitted).

The Sheriff's office has a common-law duty of attending and providing courtroom security. *See Prince George's Cnty. v. Aluisi*, 354 Md. 422, 434 (1999). Although "courtroom security is an ultimate determination that rests entirely and solely in the discretion of the trial judge[,]" *Cooley v. State*, 385 Md. 165, 184 (2005), the Sheriff undoubtedly has the authority to determine the uniforms worn by its deputies and to mandate compliance therewith. The trial court, therefore, was appropriately reluctant to exert its authority to countermand a lawful order concerning a matter squarely within the

3

Sheriff's purview. Because Mr. Smith failed to meet his burden of establishing an entitlement to such relief, the trial court properly denied his motion.

The Majority states that the most benign messages that could have been intended by the thin blue line face masks were to convey general support for law enforcement or pride in their chosen profession of law enforcement. Aside from the lack of any evidence in the record from which such a conclusion may be drawn,[2] the Majority does not adequately explain why such messages translate to an unacceptable risk that impermissible factors would come into play in the jury's decision.

As noted above, the Sheriff is an elected official. In fact, the Sheriff is elected by registered voters among the same Kent County citizens from which the jury was drawn. *See* Md. Ann. Cts. & Jud. Proc. ("CJP") § 8-103 (2006, 2020 Repl. Vol.).[3] Thus, the jurors

---

[2] Indeed, one of the articles cited by the Majority—Rita Oceguera, *In Mount Prospect, a Village Divided Over the 'Thin Blue Line,'* INJUSTICE WATCH (Sept. 2, 2021), available at https://perma.cc/A3HY-4DS6—quotes a news release from a police department in a town north of Chicago as explaining that "the thin blue lined flag honors the law enforcement officers who have made the ultimate sacrifice for their communities." How do we know that's not what the Sheriff of Kent County intended to convey? The fact is, we have no idea what the Sheriff intended to convey with the thin blue line mask or how it was received by the citizens of Kent County.

[3] CJP § 8-103 provides:

**Age, citizenship, and residency requirements**

(a) Notwithstanding § 8-102 of this subtitle, an individual qualifies for jury service for a county only if the individual:
   (1) Is an adult as of the day selected as a prospective juror;
   (2) Is a citizen of the United States; and
   (3) Resides in the county as of the day sworn as a juror.

**Disqualifying factors**

4

knew that the Sheriff was an officer separate and distinct from the circuit court, *State v. Chaney*, 375 Md. 168, 181 (2003) (quotation omitted) ("[j]udges, lawyers and laymen alike are all presumed to know the law regardless of conscious knowledge or lack thereof"), and therefore would not view the deputy Sheriff as an agent of the court with authority to speak on its behalf.[4]

Moreover, in addition to being screened during voir dire for bias in favor of law enforcement, the jurors were expressly and repeatedly instructed by the court to base their

---

(b) Notwithstanding subsection (a) of this section and subject to the federal Americans with Disabilities Act, an individual is not qualified for jury service if the individual:

(1) Cannot comprehend spoken English or speak English;

(2) Cannot comprehend written English, read English, or write English proficiently enough to complete a juror qualification form satisfactorily;

(3) Has a disability that, as documented by a health care provider's certification, prevents the individual from providing satisfactory jury service;

(4) Has been convicted, in a federal or State court of record, of a crime punishable by imprisonment exceeding 1 year and received a sentence of imprisonment for more than 1 year; or

(5) Has a charge pending, in a federal or State court of record, for a crime punishable by imprisonment exceeding 1 year.

**Pardon of convicted individuals**

(c) An individual qualifies for jury service notwithstanding a disqualifying conviction under subsection (b)(4) of this section if the individual is pardoned.

(Footnote omitted).

[4] The Majority does not cite to any Maryland statute or precedent to support its assertion that the deputy Sheriff is an agent of the court.

decision solely on the evidence admitted in the trial and that they should not read anything

into any of the court's rulings. Here's an example:

> After the closing arguments, you will begin your deliberations. You must decide this case based on the evidence produced at trial. Nothing the Court may say or do during the course of trial intended to indicate or should be taken by you as indicating what your verdict should be.
>
> During any break or recess, including any overnight break, you must not conduct any research or investigation about the case or any of the individuals involved in it. You may not consult with any dictionaries, reference materials, search the internet, websites, blogs or consult other sources for information about the case. You must not visit any place mentioned in this case. You must discuss the case fairly and impartially based only on the information presented together to you and your fellow jurors in the courtroom. Until you retire to deliberate and decide the case, you must not discuss this case with anyone else. You should not even discuss the case with your fellow jurors. I know that this request seems odd as this case is the only reason that you all have been brought together. But the reason that I'm asking you not to discuss the case until you begin your deliberations is that evidence comes to you in little bits and pieces throughout the course of the trial. If you start to talk about the case too soon, you may start to form opinions before you have heard all of the evidence and the instructions on the law and the arguments of the attorneys. In order to remain fair and impartial, you should not discuss and decide this case until you begin your deliberations.

At bottom, even if the jurors saw the deputy's mask and thought to themselves:

"now there's a guy who is proud to be a law enforcement officer in these tumultuous and

turbulent times," I have no reason to believe that would have posed any material risk that

impermissible considerations would come into play in the jury's deliberations. That is

particularly true here because, as pointed out by the Court of Special Appeals, this was not

a case in which the conduct of the police was put at issue, but rather a case where a father

is being tried for assaulting his daughter.

Even if the record had contained the materials supplied by Mr. Smith and the amici on appeal, in my view, the Court of Special Appeals got it exactly right when it stated:

> No doubt, the "thin blue line" flag is perceived by many as a racist symbol antithetical to the Black Lives Matter Movement. Others, however, perceive the "thin blue line" flag to be a general symbol of support of law enforcement or pride in policing. In this appeal, however, we are not asked to determine whether the wearing of a "thin blue line" flag face mask by courtroom bailiffs is a wise practice, or whether Chief Judge Morrissey's prohibition of the wearing of such symbols in the District Court of Maryland was a prudent and sensible decision. Indeed, Judge Morrissey's determination that "[e]mployees of the District Court wearing any clothing item or apparel which promotes or displays a logo, sticker, pin, patch, slogan, or sign which may be perceived as showing bias or favoritism to a particular group of people could undermine the District Court's mission of fair, efficient, and effective justice for all and call into question the Judiciary's obligation to remain impartial and unbiased" is eminently reasonable. It is entirely appropriate for the judiciary and individual judges to take measures to ensure that all court personnel -- from the judge to the courtroom clerk to the bailiff -- appear neutral and unbiased at all times. In this appeal, however, we are mindful of the precise determination before us: whether the wearing of a "thin blue line" flag face mask by a courtroom bailiff is so inherently prejudicial as to deprive an accused of his constitutional right to due process.

*Smith v. State*, 253 Md. App. 25, 40–41 (2021), *cert. granted*, 477 Md. 382 (2022) (footnote omitted).

I also agree with the sentiments expressed by intermediate appellate court when it stated:

> In our view, the symbol of the "thin blue line" flag does not have one generally accepted meaning but instead is interpreted as meaning a variety of different things. Notably, the context in which the "thin blue line" face mask was displayed in this case must be considered. Specifically, the "thin blue line" flag at issue in this case appeared on the face mask of a uniformed and armed law enforcement officer serving as a courtroom bailiff. Inasmuch as the "thin blue line" flag is seen by some as a symbol of general support for law enforcement, a reasonable juror may have inferred that the law enforcement officer wearing the "thin blue line" flag face mask was doing so in order to display his pride in being a law enforcement officer. As

7

in *Holbrook*, jurors may have drawn a "wide[ ] range of inferences" from the bailiff's face mask. Accordingly, we reject Smith's inherent prejudice argument and hold that the wearing of a "thin blue line" flag face mask by a uniformed courtroom bailiff did not constitute inherent prejudice depriving Smith of his right to a fair trial.

We are mindful to make explicit what this opinion does not hold. We do not suggest that a bailiff wearing a "thin blue line" flag face mask is a good practice, nor do we suggest that prejudice can *never* arise in different circumstances in which *actual prejudice* rather than *inherent prejudice* is alleged. Indeed, a litigant may have a reasonable argument that a bailiff wearing a "thin blue line" flag face mask caused *actual prejudice* in a case involving, for example, allegations of excessive force or other misconduct by a law enforcement officer, or in a case in which a law enforcement officer's credibility is weighed against that of a layperson. Our opinion in this case does not foreclose such an argument. Furthermore, a prohibition on the wearing of "thin blue line" symbols by courthouse staff may be a prudent prophylactic measure to avoid issues on appeal, as well as to err on the side of caution to ensure litigants' right to a neutral and fair tribunal. Here, however, we do not deal with allegations of actual prejudice. Our holding, therefore, is limited to the inherent prejudice argument raised in this case and discussed *supra*.

*Id.* at 43–45.

In conclusion, I simply do not believe, on this record, that the deputy Sheriff's use of the thin blue line face mask deprived Mr. Smith of a fair trial. That said, I share the Majority's underlying concern about the portrayal of symbols and messages of political or ideological content in the courtroom by any person affiliated with the State or law enforcement. As we noted in *Aluisi*, a sheriff's authority is subject to the "rules of the Court of Appeals. . . . to the extent that the matter involves practice and procedure in the courts or the administration of the judiciary, by the Court of Appeals." 354 Md. at 433. Irrespective of whether Mr. Smith's right to a fair trial was inherently prejudiced, this case

illustrates the need for this Court to exercise its rulemaking authority to prevent this situation from arising in the future.

For the foregoing reasons, I respectfully dissent.

Judge Getty has authorized me to represent that he joins this dissent.